CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review pursuant to N.J.S.A. 54:3-21 of the 1988 assessment on its property located at 50 Central Avenue, Kearny, New Jersey (Block 288, Lot 1). The assessment was:
[[Image here]]
At issue are the true value of the subject property, the taxable status of certain machinery and equipment under N.J. *390 S.A 54:4-1, as amended by L. 1986, c. 117, whether certain storage tanks are taxable as real property pursuant to N.J.S.A. 54:4-1.12 and whether chapter 123 (N.J.S.A. 54:51A-6 in the Tax Court) applies to increase or reduce the assessment.
The subject of this proceeding is an owner-occupied chemical plant comprised of 27 buildings erected from 1910 to 1987 and containing, in the aggregate 147,787 square feet, 73 chemical storage tanks, site improvements consisting of cast iron piping (serving as fire lines), fire hydrants, steam lines, plant water lines, roadway paving, concrete paved walkways, a truck scale, perimeter and interior fencing, railroad siding, stacks, bulkhead and a boiler unit. Of the 73 storage tanks, 42 have capacities of 30,000 gallons or less. The plant is sited on 27.136 acres of land in South Kearny at the terminus of Central Avenue. The site is on a point of land at the confluence of the Passaic and Hackensack Rivers.
The 73 storage tanks house chemicals used in plaintiff’s' manufacturing process. These tanks, by virtue of the corrosive quality of the chemicals stored in them, have relatively short lives of 7 to IIV2 years. They are indispensable to plaintiff’s manufacturing process.
The disputed items of machinery and equipment are: (1) the seven items housed in the building known as the batch ester building utilized in the process known as esterification, a chemical process involved in the manufacture of plasticizers, and (2) the components of a steam turbine generator which supplies 40% of the electricity required in plaintiff’s manufacturing operations. None of these disputed items of machinery and equipment was separately assessed. Moreover, construction of the generator was completed in October or November 1987 and was not placed in service until January 19, 1988.
Plaintiff’s expert estimated the true value of the subject property, including the tanks but excluding the disputed machinery and equipment items, which he concluded were personal property, to be $5,155,000. In arriving at this conclusion of value he relied solely on the reproduction cost approach. His *391 estimates for both reproduction cost new and depreciation were derived from the Marshall & Swift Valuation Quarterly (M & S). He assumed buildings of steel frame construction (Class C) and average quality. The M & S figures were based on the segregated cost method, which includes architect’s fees. The M & S age-life depreciation tables, he asserted, include both physical deterioration and functional obsolescence.
He assigned a reproduction cost new of $6,696,013 to the 27 buildings. On the basis of the M & S calculations, tempered by his own physical observation, he concluded that the accumulated depreciation, including functional obsolescence on the assessing date, of the building was $3,409,897 (51%) before any adjustment for economic obsolescence, resulting in a true value estimate of $3,286,116.
He then valued what he described as structures, i.e. two additional buildings erected in 1981. One of these buildings was the batch ester plant. He assigned a reproduction cost new to these structures of $1,114,008 and a life expectancy of 11.5 years, resulting in a depreciation allowance of 52%. He estimated the depreciated value of these structures, prior to any adjustment for economic obsolescence, to be $532,786.
The expert went on to estimate the value of the 73 chemical storage tanks. The reproduction cost new assigned to the tanks was derived from the Marshall Valuation Service Manual (the manual). He adjusted the manual cost for insulation where appropriate, for time and for location, thereby arriving at reproduction cost new of $2,570,130. The manual age-life tables for tanks in the chemical industry indicate a range in useful lives of 7 to 11.5 years. From the reproduction cost new he subtracted an aggregate depreciation for all 73 tanks of 74% to arrive at a true value of $660,387 on the assessing date.
After developing his value estimates for all the buildings, the tanks and site improvements, he ascribed an economic obsolescence factor of 23% to the undepreciated cost of the buildings and structures. He opined that the plant, for safety reasons, was required to remain in continuous operation 24 *392 hours a day, seven days a week, even though it was operating at no more than 80% of capacity. The expert observed that shutting down and starting up chemical plant operations created serious risks of explosions. The plant manager’s testimony supported this conclusion. Moreover, labor costs could not be reduced to compensate for declining sales, as this would mean layoffs of highly skilled employees, who in all likelihood, would be unavailable for re-employment when sales improved. Finally, the expert opined that the plant could remain in operation only so long as the storage tanks were in service and the useful economic lives of the tanks were shorter than the useful lives of the plant buildings.
The expert declined to include the steam turbine generator and the machinery and equipment in the batch ester plant in his valuation, as he concluded that those items were personal property.
He posited a land value of $2,280,000 ($84,000 an acre) on the basis of four allegedly comparable sales of vacant land. The sales occurred in March 1980, June 1982, December 1983 and January 1988. The unadjusted sales prices ranged from $66,-176 an acre for the June 1982 sale to $108,751 an acre for the December 1983 sale. Only one of the four sales involved property similar in size to the subject and that was the June 1982 sale of 17 acres on Central Avenue in south Kearny. The three other sales, all in Kearny, involved acreage of 2.52, 3.95 and 3.37. The expert made substantial time adjustments for the sales of 1980, 1982 and 1983 and large size adjustments for the 1980, 1983 and 1988 sales.
Defendant proffered three experts. Martin Sigel valued the buildings, tanks and site improvements, Herbert G. Worcester, an engineer, valued the machinery and equipment in the batch ester plant and the steam turbine generator, and William J. Stack II valued the land. Their composite true value estimate for all these items was $12,063,395, broken down as follows:
*393 [[Image here]]
* Includes value of $323,385 for steam turbine generator building.
Sigel purported to use replacement cost, not reproduction cost new, but he used the same cost manual that plaintiffs expert used. That manual, the Marshall & Swift Valuation Quarterly, employs reproduction cost new but with more current building materials. Sigel found some functional obsolescence but it was confined to a handful of buildings. His reasoning in this regard was predicated on the nature of the replacement cost method, which, by replacing older structures with newer ones of equivalent utility but with improved design and modem materials, eliminates most forms of functional obsolescence. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) 352.
Sigel’s depreciation allowances were based upon data found in the Marshall Valuation Service Manual and his own physical observations.
In valuing the machinery and equipment in the batch ester plant and the steam turbine generator, Worcester simply trended the original cost of the equipment and then applied physical depreciation in accordance with the manual.
Stack’s land value estimate of $3,581,000 was based upon five vacant land sales, all in Kearny, which occurred between June 1982 and June 1988. The properties involved ranged in size from 13.8 acres to 154.9 acres. After adjustments (some as large as 33% and 46%) for size, time and location, Stack arrived at a value estimate of $132,000 an acre for the subject.
Both real property valuation experts utilized the cost approach to the exclusion of the other two approaches to value. Plaintiff’s expert felt that insufficient data relative to sales and leases of chemical plants precluded the use of the market data *394 and income approaches to value. Sigel opined that, because of the design nature of the facility, the subject was special use property which could be valued only under the cost approach.
There is no single doctrinaire approach to the valuation of real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965). The choice of the predominant approach depends upon the facts of each case and the reaction of the experts to those facts. Shulton, Inc. v. Clifton, 7 N.J.Tax 208 (Tax Ct.1983), aff'd 7 N.J.Tax 220 (App.Div.1984). In this case both Sigel and plaintiffs expert agree on the cost approach to the exclusion of the other approaches. Accordingly, the court will determine the true value of the subject under the cost approach.
Sigel and plaintiffs valuation expert relied upon the same cost manual in developing their respective replacement cost and reproduction cost new. Their differences lie in their respective depreciation allowances. Inherent in Sigel’s replacement cost approach is the virtual elimination of functional obsolescence, while plaintiffs expert claims that the Marshall Valuation Service Manual includes functional obsolescence in his depreciation schedules for chemical plant buildings. It is hard to envision exactly how such a particularized, judgmental adjustment can be made with computer-generated data based upon information collected on an industry-wide basis.
In any event, the experts’ respective depreciation allowances, exclusive of economic obsolescence, are not substantially divergent. The experts differ, however, on the existence of economic obsolescence. Plaintiff’s expert concludes that the need, for both safety reasons and to avoid layoffs of skilled employees, to operate the plant around the clock even though the market for plaintiff’s products caused diminution of production to 80% of the plant’s capacity, resulted in economic obsolescence. A credible method of quantifying such obsolescence is to ascertain the difference in plant depreciation and the more rapid depreciation of the tanks on the theory that when the tanks are no longer useful the plant will shut down. That difference, ac *395 cording to plaintiffs expert, is 23% (74% tank depreciation less 51% plant depreciation). While the court does not accept plaintiffs estimate of 51% depreciation on the buildings (Sigel’s estimate of 43% being more persuasive) plaintiff’s expert’s estimate of economic obsolescence is reasonable and is supported by sound analysis. I therefore find that the buildings suffer from 23% economic obsolescence.
I find the true value of the 27 buildings to be $3,250,235.
Sigel’s estimate of the value of site improvements is more probative than the true value posited by plaintiff’s expert. The latter overlooked several significant items, such as the fire lines and fire hydrants, steam lines, plant water lines, truck scale, steel stacks, bulkhead and boiler units. I find the true value of the site improvements, taking all forms of depreciation into account, to be $1,230,892 as estimated by defendant’s valuation expert.
Both valuation experts appraised all 73 chemical storage tanks on the premises. Of these tanks 42 have capacities of 30,000 gallons or less. N.J.S.A. 54:4-1.12 provides that a tank having a capacity in excess of 30,000 gallons is deemed to be real property. The statute is silent as to a tank with a capacity of 80,000 gallons or less. The tests of N.J.S.A. 54:4-la and -lb, set forth below, must be used to determine whether tanks of capacities not exceeding 30,000 gallons are to be taxed as real property. Texas Eastern Transmission Corporation v. Division of Taxation, 11 N.J.Tax 198, 211 (Tax Ct.1990).[1]
In this ease the parties agree that all the tanks, irrespective of capacity, constitute real property. Accordingly, the court finds that all 78 tanks are taxable as real property.
*396 The evidence of plaintiff’s expert was more persuasive on the issue of tank valuation. He relied upon the age-life schedules of the manual, which take into account the effect of chemicals on the useful lives of storage tanks. Sigel, on the other hand, made no reference to the manual in his valuation of the tanks, although he relied upon the manual in other areas of his appraisal; nor did he appreciate the effect of chemicals on the lives of the tanks. I find the true value of the 73 tanks, taking into account depreciation based upon a useful life for all tanks of 11.5 years, to be $660,387.
The next issue to be addressed is the taxable status of machinery and equipment situated in the batch ester plant and the steam turbine generator. Plaintiff’s expert declined to value these items as he considered them to be personal property. Defendant, of course, contends that the items are taxable as real property by virtue of N.J.S.A. 54:4-1, as amended by L. 1986, c. 117.
Before the taxable status of the items in question can be resolved, however, the court must deal with the procedural significance of (1) defendant’s failure to assess the disputed items and (2) the fact that the steam turbine generator was not assembled and placed into service until some months beyond the assessing date.
Notwithstanding defendant’s failure to assess the machinery and equipment in the batch ester plant, the court must nevertheless consider the value of the items in determining the full and fair value of the entire property (assuming the machinery and equipment in question is taxable as real property). As Judge Andrew of this court observed in Chevron U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 571 (Tax Ct.1988):
Therefore, whether the tax assessor failed to consider the pollution control equipment in his assessment of plaintiffs real property is of no significance. This court is required, upon plaintiffs complaint, to review the assessment de novo and apply the same statutory criteria that direct the assessor in the discharge of his statutory duty. That requires a consideration of all of plaintiffs real property "not expressly exempted” or "expressly excluded” from local property taxation. N.J.S.A. 54:4-1. [at 581]
*397 The steam turbine generator is a different matter. The assessor did not simply fail to assess the generator as part of plaintiff’s taxable property. The generator did not exist on the assessing date.
Accordingly, while the court may consider the value of the machinery and equipment in the batch ester plant, if it is indeed taxable as real property pursuant to N.J.S.A. 54:4-1, as amended, the value of the steam turbine generator may not be considered in the court’s determination of the true value of plaintiff’s property for tax year 1988.
The statute governing the taxable status of the machinery and equipment in the batch ester plant is N.J.S.A. 54:4-1, as amended by L. 1986, c. 117, which provides, pertinently:
... Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
a. (1) The personal property so affixed can be removed or severed without material injury to the real property;
(2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
(3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property; or
b. The personal property so affixed is machinery, apparatus, or equipment which is neither functionally essential to a structure the personal property is within or to which the personal property is affixed nor constitutes a structure itself.
The credible testimony of defendant’s engineering expert, Worcester, reveals that the chemical process known as batch esterification, integral to the manufacture of plasticizers, takes place in the batch ester building. Machinery and equipment involved consists of seven items: an esterification reactor, a washer/stripper, a water tank, an alkaline wash drum, a funda filter, a reactor packed column and a solids weigh hopper. The first two items occupy the first and second floors of the batch ester building; the reactor is 13' x 15' in size, while the washer/stripper is 13' X 25'. The funda filter also occupies the first two floors. The reactor packed column (4' X 21') and the solids weigh hopper (10' X 28') occupy the second and third floors of the building. The building was erected around the seven items *398 in question. Worcester testified that none of the seven items could be removed from the building without structural damage.
Worcester went on to state, in response to the court’s questions, that all seven items were the kind of equipment that would remain permanently in place. As Worcester put it, “They’re there for good.”
To qualify for the exclusion from taxation as real property, provided for in N.J.S.A. 54:4-l(a), the proponent must show not only that the property in dispute can be removed without material injury either to the building to which the property is affixed or to the property itself but also that the property so affixed is not ordinarily intended to remain permanently affixed to the real property. Failure of the proponent to satisfy both tests means that the machinery and equipment, subject to the provisions of N.J.S.A. 54:4-l(b) are taxable as real property. Chevron U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 205, 233 (Tax Ct.1987).
As for the material injury aspect, plaintiff’s plant manager disputed Worcester’s conclusion that the machinery and equipment in the batch ester building could not be removed without structural damage to the building. The manager indicated, however, that the larger pieces of equipment, i.e., the reactor, the washer/stripper and the weigh hopper, would have to be cut up to be removed. The remaining items, he testified, could be removed from the building without damaging them.
The court finds that it is not necessary to resolve the conflicting testimony of defendant’s engineering expert and plaintiff’s plant manager concerning material injury to the batch ester' building or to the machinery and equipment affixed thereto, because the credible, uncontradicted testimony of defendant’s engineering expert indicates that the kind of machinery and equipment found in the batch ester plant is ordinarily intended to remain permanently. The focus is on the ordinary intention regarding permanent annexation of the type of property in issue, not the actual intention of the owner of the particular property before the court. N. Y.T. Cable TV v. Audubon Boro., *399 9 N.J.Tax 359 (Tax Ct.1987), aff'd 230 N.J.Super. 530, 553 A.2d 1368 (App.Div.1989); American Hydro Power Partners v. Clifton, 11 N.J.Tax 12 (Tax Ct.1990).
Accordingly, the court concludes that the seven items of machinery and equipment located in the batch ester building are taxable as real property within the purview of N.J.S.A. 54:4-1(a). The court also concludes that the batch ester building is special purpose in character.
At this point the court must consider the impact of N.J.S.A. 54:4-l(b), which constitutes an alternate ground for exclusion of machinery and equipment from taxation as real property. Under the statute machinery and equipment affixed to real property is not taxable as real property if it is neither functionally essential to a structure within which it is situated (or to which it is affixed) nor constitutes a structure itself. If it is established that the property is functionally essential to a structure within which it is located it is not necessary to decide whether the property itself constitutes a structure.
The statute empowers the Director of the Division of Taxation to adopt rules and regulations “as may be deemed necessary to implement and administer the provisions of this act.” Acting pursuant to the authorization the Director promulgated regulations which purported to define, among other things, the term “functionally essential” as referring to “machinery, apparatus or equipment necessary for the habitability of the structure, including, but not limited to, such items as air conditioning and heating equipment or apparatus, lighting and bathroom fixtures, elevators, escalators, electrical wiring, plumbing, etc.” N.J.A.C. 18:12-10.1.
The same regulation defines “structure” as “any assemblage of building or construction materials fixed in place for the primary purpose of supporting, sheltering, containing, or enclosing persons or property. The term ‘structure’ does not include machinery, apparatus or equipment which the structure is designed to hold in place, shelter, contain or enclose.”
*400 In Texas Eastern Transmission Corporation v. Division of Taxation, supra, Judge Lasser, writing for a unanimous court in a case decided en banc pursuant to R. 8:8-6, concluded that the quoted definitions of “structure” and “functionally essential” as set forth in N.J.A.C. 18:12-10.1 had no application to special purpose property such as the subject. In this regard Judge Lasser declared:
... This definition of a structure appears to be consistent with legislative intent when applied to general purpose real property. However, this definition is too restrictive when applied to a special purpose property. An oil refinery does not have as its primary purpose the supporting, sheltering, containing or enclosing of persons or property, nor does a brewery, a public utility transformer station or a radio transmission tower, yet they are all structures. The legislative intent was to include oil refineries within the definition of real property, not to exclude them as machinery, apparatus or equipment. I therefore find that the Director’s definition of structure is limited to general purpose property and for special purpose property “structure” has a broader meaning.
Similarly, the use of the word “habitability” in the portion of the regulation defining “functionally essential" may be suitable for use in identifying machinery, apparatus and equipment which is to be taxed as real property when dealing with general purpose property. However, the use of the word “habitability” limits the definition of “functionally essential” to property with the primary purpose of sheltering or enclosing persons, omitting real property with the primary purpose of sheltering or enclosing property. The word "habitability” in the regulation is, therefore, inappropriate and contrary to legislative intent when applied to special purpose property. I therefore find that the Director’s definition of “functionally essential” is limited to general purpose property, and for special purpose property the word “purpose” must be substituted for the word “habitability” in order to carry out the intent of the Legislature. Thus, the definition of “functionally essential” must be read together with the definition of “structure” and against the background of the intent of the Legislature in enacting the chapter 117 amendment to find that for special purpose property “functionally essential” means supporting, sheltering, containing or enclosing persons or property which are functionally essential for such special purpose.
Administrative regulations must be within the fair contemplation of the delegation of the enabling statute, [citations omitted] I conclude that N.J.A.C. 18:12-10.1 is not within the fair contemplation of the enabling statute to the extent that it deals with special purpose real property, and that the definition of the term “structure” and the use of the word “habitability” in the definition of “functionally essential” are invalid insofar as they may apply to special purpose property such as the subject pipeline.
Inquiry must, therefore, be made of the purpose of the property. Personal property affixed to a general purpose property is to be taxed as real property *401 when it is necessary for the operation of the structure. Machinery, apparatus or equipment used in the business conducted in the structure and customarily removed when the real property is sold is not to be taxed as real property. However, if the property is special purpose property, as in the subject case, the operation of the structure and the operation of the business conducted therein merge. That which would be regarded as machinery, apparatus or equipment and not taxed as real property if contained in a general purpose property is taxed as real property when affixed to special purpose property because it is functionally essential to the “special purpose.”____ [11 N.J.Tax at 208-211]
The quoted passages apply squarely to the batch ester plant involved in this proceeding. As the court has found, the batch ester plant is a special purpose property, so its operation and the operation of the business conducted therein, i.e., the manufacture of plasticizers, are merged. The property employed in the process of esterification carried on in the structure is functionally essential to the special purpose.
In view of the foregoing the court finds that the machinery and equipment located in the batch ester building is taxable as real property pursuant to N.J.S.A. 54:4-1, as amended by L. 1986, c. 117.
The next issue to be resolved is the true value of the batch esterification machinery and equipment on the assessing date. The only credible evidence on this point came from Worcester’s testimony. He began with the 1981 original cost of the seven items ($468,200), applied a trending factor for time (1.237) and then estimated physical depreciation at 38%. This exercise produced a true value estimate of $359,080. Worcester’s approach is, for the most part, a sound one. Trending a known historical cost into a current cost estimate is an acceptable valuation approach. The Appraisal of Real Estate, supra at 361-362. See Chevron U.S.A., Inc. v. Perth Amboy, 10 N.J.Tax 114,151 (Tax Ct.1988) aff’d o.b. per curiam 237 N.J.Super. 280, 567 A.2d 597 (App.Div.1989). Furthermore, it is well settled that the original cost of construction may be considered in a tax valuation proceeding. Bostian v. Franklin State Bank, 167 N.J.Super. 564, 401 A.2d 549 (App. Div.1979), on remand 1 N.J.Tax 270 (Tax Ct.), aff’d o.b. per curiam 179 N.J.Super. 174, 2 N.J.Tax 391, 430 A.2d 1140 *402 (App.Div.1980); Trenton v. John A. Roebling Sons Co., 24 N.J.Super. 213, 93 A.2d 785 (App.Div.1953). See Abe Schrader Corp. v. Secaucus, 8 N.J.Tax 390, 394 (Tax Ct.1986).
The court finds, however, that the same economic obsolescence which burdens all the buildings comprising the chemical plant applies with equal force to the batch esterification machinery and equipment. Thus, the court concludes that the true value of such machinery and equipment is $276,490, the value estimate developed by Worcester, reduced by a 23% economic obsolescence factor.
Before addressing the issue of land value the court must deal with defendant’s argument that entrepreneurial profit should be added to the value determined under the cost approach. (The court notes that none of the experts added entrepreneurial profit to their cost-based value estimates.)
Appraisal theory appears to dictate consideration of entrepreneurial profit because it motivates developers to construct improvements. American Institute of Real Estate Appraisers, op. cit., supra at 360. In the instant case, however, no proofs of entrepreneurial profit were offered. Hence, the court can make no finding in that regard.[2]
Finally, the court will deal with the issue of land value. Of the four comparable land sales proferred by plaintiff's expert, three are too remote in time to be probative of the subject property’s land value on October 1, 1987. The fourth sale, occurring January 1988, involved only 3.376 acres; the expert made negative adjustments of 40% for size and utility. The magnitude of these adjustments vitiates the probative value of the sale. Evidence of comparable sales is effective in determining value only where there is a substantial similarity *403 between the properties so as to admit of reasonable comparison. Venino v. Carlstadt Boro., 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div.1981).
Defendant’s land valuation expert, William J. Stack II, proffered five land sales. The court rejects the June 1982 sale as too remote in time. The sale of June 1988 is likewise rejected because of its size (154.9 acres) and the fact that 51 acres are under water. These two factors compromise the probative utility of the sale. Stack’s sale of January 1984, involving 76.6 acres, requires adjustments for time (36%) and size (10%). The magnitude of these adjustments vitiates the probative quality of the sale.
Stack’s two remaining sales, however, offer persuasive evidence of the subject’s land value. The sale of March 1985 of 13.8 acres involves property comparable in size to the subject, it is in reasonable proximity to the subject and is comparably zoned. The sale price was $105,000 an acre, which, adjusted for time, becomes $121,000 an acre. The April 1988 sale of 16 acres for $130,516 an acre also involves property comparable in size, location and zoning to the subject land. The time-adjusted sale price was $117,000 an acre.
On the basis of Stack’s two comparables I find the true value of the subject land to be $120,000 an acre on October 1, 1987.
In view of all the foregoing the court finds the true value of the subject property on October 1, 1987 to be $8,674,300,
composed of the following:
[[Image here]]
Plaintiff is entitled to relief pursuant to chapter 123, as the assessment exceeds the property’s true value. That relief is implemented by application of the Director’s average ratio *404 promulgated for the defendant taxing district for tax year 1988 (77.79%) to the true value as herein found. N.J.S.A, 54.-51A-6(b).
Judgment will be entered indicating the assessment to be:
[[Image here]]

 The statement of this court in Chevron, U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 205, 233 (Tax Ct.1987), that a tank with a capacity of 30,000 gallons or less is not taxable as real property is dictum, as the court was dealing with tanks having capacities in excess of 4 million gallons.

 It has been observed that, where older buildings are concerned, the entrepreneurial profit component is often dissipated by a growing element of economic obsolescence. When that happens the property's market value falls below its reproduction or replacement cost less physical depreciation. Kiske, "The Use and Misuse of Entrepreneurial Profit,” 1 Journal of Property Taxation, 109, 114 (1989).