CRABTREE, J.T.C.
These consolidated cases involve the 1988 and 1989 property tax assessments of residential condominium units in the Wedge-wood Knolls Condominium development in West Paterson. Some 83 unit owners appealed their 1988 assessments to the Passaic County Board of Taxation, which reduced those assessments by 3.59% to 3.85%, depending on the unit model. The municipality filed a complaint with this court seeking a restoration of the original assessment for all 83 units. Five days later, 53 of the 83 unit owners filed complaints with this court seeking further reductions.
While those cases were pending in this court, 102 unit owners appealed their 1989 assessments (which were the same as the 1988 assessments) to the county board. The Wedgewood Knolls Condominium Association (the association) also appealed the 1989 assessment on its clubhouse property. Because the 1988 cases were pending in this court, the board affirmed all the 1989 assessments without prejudice.
The 1988 and 1989 cases were consolidated for trial.
*518 At issue are the true value of the units under review, whether the assessments are spot assessments in violation of the New Jersey and Federal Constitutions, whether any of the unit owners are entitled to relief from discriminatory assessments on constitutional grounds, whether any of the unit owners are entitled to statutory relief from discriminatory assessments pursuant to N.J.S.A. 54:51A-6 (chapter 123) and whether the association clubhouse was a common element and thus not amenable to separate assessment.
Wedgewood Knolls is a townhouse-style residential condominium complex comprised of 182 units, plus common elements. There are three models: “Aspen,” “Sequoia” and “Sycamore,” each of which is available either as a two-bedroom unit or a three-bedroom unit, for a total of six different unit types. The complex is new construction, built and marketed by Prospect Development Corporation (the developer) beginning in 1986. A public offering statement (pos) was issued on April 17, 1986. The first closings on sold units occurred in or about November 1986.
The developer and the municipality's assessor reached an agreement in 1986 to set the assessments on completed units at 66% of their market values, which were determined on the basis of offering prices and some early sales. This agreement was reached before any of the improvements were completed, at a time when only the land component of each unit was assessed.
The assessments for the six models and the true values ascribed to them were as follows:
[[Image here]]
*519 The assessments were maintained through 1988 and 1989.
The pos provides that the purchaser of a condominium unit will acquire an appurtenant interest in the common elements as part of the purchase. The common elements are defined in the pos to include recreational facilities, which consist of a clubhouse, tennis courts, an outdoor pool and a jogging trail. The clubhouse is located on the third floor of a three-story building situated in a adjoining mixed-use condominium known as Wedgewood Plaza. The first floor of the building is occupied by retail stores, while the second floor is taken up by apartments and offices. The pos also indicates that the retail stores, apartments and offices, and clubhouse are units of the Wedge-wood Plaza Condominium and that the association is the owner of the clubhouse unit. The pos goes on to state that the association, as owner of the clubhouse unit, will pay maintenance fees to the management association of Wedgewood Plaza and real estate taxes on the unit. Finally, the pos indicates that the recreation facilities of Wedgewood Knolls will also be available to residential unit owners in Wedgewood Plaza for an initial annual fee of $300, subject to adjustments in future years to reflect changes in the consumer price index.
The 1989 assessment on Block 124, Lot 6J, the three-story building in which the clubhouse was located, was:
[[Image here]]
The general average ratios and the upper limits of the common-level range, as promulgated for West Paterson by the Director, Division of Taxation for tax years 1986 through 1990 were:
[[Image here]]
*520 Sales, by unit models, occurred in the two-year period commencing July 1, 1986 as follows:
[[Image here]]
Sales, by unit models, occurred between July 1, 1988 and December 31, 1988 as follows:
[[Image here]]
The following resales occurred during the period July 1, 1986 to December 31, 1988:
*521 [[Image here]]
Unit # 267, a Sequoia 3 model, resold again on February 2, 1989 for $300,000.
For 18 months following October 1, 1988 only 11 sales of Wedgewood Knolls units occurred. Six of those sales were resales. On March 4, 1990, the developer held an auction sale at which the remaining 37 new units were sold for prices substantially less, on average, than the market values negotiated by the developer and the municipal assessor in 1986.
Taxpayers’ expert did not estimate the true value of each condominium unit under appeal. Rather, he averaged the sale prices of all units sold (whether or not the unit was the subject of a tax appeal), from the initial sales in 1986 to sales through June 30, 1990, including resales but excluding the auction sales. He arrived at average sale prices on the basis of unit models, sales of units under appeal and sales by years. For example, he shows the average prices of Aspen 2 sales in the following manner:
[[Image here]]
*522 [[Image here]]
* July 1 — June 30
The expert performed the same exercise for the other five unit models.
While he indicated that, in his opinion, the sale prices reflected the market value of the sold units he argued that average sale prices over a period of time constitute a more reliable indicator of value.
 The expert’s methodology is without merit. To begin with, absent countervailing circumstances, the selling price of real property involved in a tax valuation proceeding is cogent evidence of its value. Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 65 A.2d 828 (1949); Niktan Realty Co. v. Passaic City, 1 N.J.Tax 393 (Tax Ct.1980). The best evidence of the true value of each condominium unit involved in these appeals is the price for which it was sold, adjusted for time when appropriate. Second, real property must be valued for tax purposes as at October 1 of the pretax year. N.J.S.A. 54:4— 23. The expert’s method of valuation ignores that statutory requirement and fails to consider the effect of appreciation, as reflected in price changes, over the multi-year averaging period. Third, the expert’s approach presupposes a fungibility within each category of unit model which has not been shown to exist. In addressing the use of sale price averaging in the related context of comparable sales, two noted authorities have observed:
*523 Unless there are many adjusted sales prices and the appraiser can accept the assumption that each comparable sale has equal significance or validity (and therefore should be given weight), an arithmetic average should not be used. Certainly, averaging for three to four observations is extremely hazardous. Greatest emphasis is placed on the adjusted sales price figures for the comparable properties that are regarded as most nearly similar to the subject property. One guide is the amount of adjustment required (provided that they are reasonable in size)____ [Boyce and Kinnard, Appraising Real Property (1984) at 198].
The evidence in this case negates fungibility, i.e., that each unit model is identical in all respects to every other unit model. For example, one Aspen 2 unit sold on January 19,1988 for $255,000, another Aspen 2 unit sold on January 29, 1988 for $272,000; one Aspen 3 unit sold on December 23, 1987 for $276,000, another Aspen 3 unit sold on April 15, 1988 for $305,000; a Sequoia 3 unit sold on April 6, 1988 for $269,000, another Sequoia 3 unit sold on June 24, 1988 for $307,000. In all these examples, the difference in sale prices is too large to be accounted for by the passage of time. There must have been other considerations contributing to the market superiority of some units over others of the same model such as location, interior finish, view and wooded setting. Fourth, the sharp decline in sales prices which first appeared in 1990 has no bearing on the true value of the units under appeal for 1988 and 1989. The latest relevant assessing date is October 1,1988, approximately 18 months before the auction sale of 37 units at prices significantly lower than the prices realized in 1986, 1987 and 1988. The 1990 decline in value was not foreseeable on October 1, 1988, as the sale prices of units of all models continued to rise through August 1989. For example, a Sycamore 3 unit which originally sold on August 21, 1987 for $250,000 was resold on July 14, 1989 for $272,000; a Sycamore 2 unit that sold on February 24,1987 for $220,000 was resold on August 2, 1989 for $232,000.
The relevant statute provides that each condominium unit must be separately assessed as a single parcel, N.J.S.A. 46:8B-19. The true value of each unit under appeal will thus be determined by reference to its sale price, adjusted for the months elapsed between the date of sale (including, where *524 appropriate, the resale) and the relevant assessing date. An examination of the change in average ratios, together with a look at the price changes on resales, leads the court to conclude that values of units in Wedgewood Knolls were increasing at the rate of 1% a month from the earliest sales in 1986 to and somewhat beyond October 1, 1988 the assessing date for tax year 1989.
Special attention must be given, however, to five unit sales that occurred after October 1, 1988. Our Supreme Court has held that a post-assessing date sale of the subject property is competent evidence of its value on the assessing date provided that the sale is not remote in time. Glen Wall Associates v. Wall Tp., 99 N.J. 265, 283, 491 A.2d 1247 (1985). Thus, a sale two months after the assessing date is “entitled to great weight,” Rek Investment Co. v. Newark, 80 N.J.Super. 552, 560, 194 A.2d 368 (App.Div.1963); a sale 81/2 months after the assessing date was considered as a valuation factor, Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 70-71, 208 A.2d 153 (App.Div.1965); and a sale 7 months after the assessing date was “admitted for its rational probative valuation inference,” Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31, 37 (Tax Ct.1980).
The five sales in question will be analyzed in light of these principles.
Units 124 and 326, both Sycamore 3 models, were sold on November 30, 1988 and December 1, 1988, respectively, only two months after the assessing date for 1989. The sale prices, with minor downward adjustments for time, reflect the true value of those units on October 1, 1988.
Unit 410, also a Sycamore 3 model, was sold on July 14, 1989, some 9V2 months after the 1989 assessing date. Unit 327, a Sycamore 2 model, was sold on August 2, 1989, 10 months after the assessing date. As indicated above, the evidence shows a steady rise in sale prices from the earliest sales in 1986, and a continuing rise was foreseeable on October 1, 1988. Indeed, the evidence of resales shows that prices of Wedge- *525 wood Knolls condominium units continued to rise until August 2, 1989. Accordingly, the sale prices of units 410 and 327, adjusted downward for time, reflect the true value of those units on October 1, 1988.
Unit 233, an Aspen 2 model, was sold for $262,000 on November 18,1989, more than 13 months after the 1989 assessing date. Evidence of the auction sales which occurred on March 4, 1990 shows a decline in sale prices. Furthermore, the Director’s ratio promulgated for October 1, 1990 and based in part on sales occurring between July 1, 1989 and June 30, 1990, was 47.22%, reflecting a 6% decline in sale prices from the period July 1, 1988 to June 30, 1989. (The Director’s ratio promulgated on October 1, 1989 was 44.49%.) The evidence does not disclose, however, when the rise in sale prices ceased and the decline set in. There is no evidence to indicate that the rise in sale prices continued after the resale of unit 327 on August 2, 1989. Thus, a time adjustment for the sale of unit 233 on November 18, 1989 does not provide a reliable means of ascertaining the unit’s true value on October 1, 1988. Under the circumstances the sale is too remote. As there is no other evidence of the October 1, 1988 true value of unit 233, the unit owner’s case fails for lack of proof.
Plaintiffs contend that the original assessments determined by unit models in 1986 following negotiations between the developer and defendant’s assessor were “spot” assessments in violation of the uniformity and equality provisions of article VIII, § 1, par. 1 of the New Jersey Constitution. They argue that defendant has targeted an entire new development with the “welcome, stranger” approach to assessment recently condemned by our Supreme Court in West Milford Tp. v. Van Decker, 120 N.J. 354, 576 A.2d 881 (1990). That case does not support plaintiffs’ position. The Court’s decision was narrowly drawn; it simply condemned an assessment increase solely on the basis of a sale of the property. The Court recognized that assessments could be changed in years between district-wide revaluations for such legitimate reasons as new improvements, *526 reassessment of apartments converted to condominiums and reassessment of apartments upon enactment of a vacancy decontrol ordinance in a municipality with rent control. Id. at 362, 576 A.2d 881.
In this case the developer and defendant’s assessor reached an agreement in 1986 to fix the assessments of completed units at 66% of their estimated market values, which were determined on the basis of the offering prices and some early sales. This agreement was reached before any of the improvements had been completed. The earliest sale of a condominium unit was closed on October 16, 1986.
Put somewhat differently, the assessments complained of were determined ab initio on the basis of market values to be reflected in anticipated sales. Unlike the circumstances in Van Decker, no unit was singled out for an assessment increase following a sale of such unit.
In the alternative, plaintiffs argue that discrimination in the assessments of their units is shown by comparing the average assessment-to-value ratios of their properties to the average assessment-to-value ratios of Class 2 (1 to 4 family residential) properties as reflected in sales for the sampling periods 1986-87 and 1987-88. The ratios for those sampling periods, calculated on an unweighted basis, were 48.25% and 44.44%.
It is fundamental that a taxpayer is entitled to treatment commensurate with that given fellow taxpayers within the municipality; if it is not accorded the taxpayer is entitled to judicial relief. In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961). Equality of treatment in property taxation is a constitutional right. Murnick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984).
However, a taxpayer is not entitled to an assessment reduction to the level at which the properties of a particular class are assessed; the assessment may be reduced, if reduction is warranted, to the common level of assessments for all real property in the taxing district. Siegal v. Newark, 38 N.J. 57, 183 A.2d 21 (1962).
*527 Thus, in ascertaining the measure of relief to which the condominium unit owners may be entitled in these cases, the court will not resort to the average assessment-to-value ratios applicable only to Class 2 properties.
Indeed, the unit owners have not demonstrated a right to assessment discrimination relief beyond that provided by chapter 123. That statute is implemented in the Tax Court by N.J.S.A. 54:51A-6, which provides pertinently:
a. Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property except as hereinafter provided.
The average ratio is the ratio promulgated for a taxing district by the Director, Division of Taxation pursuant to N.J.S.A. 54:1-35.1 as of October 1 of the pretax year; the common level range is that range which is plus or minus 15% of the average ratio. N.J.S.A. 54:l-35a.
Absent severe or extreme circumstances or unless application of chapter 123 leaves the taxpayer with a confiscatory assessment, a taxpayer’s right to relief from a discriminatory assessment must be determined in accordance with chapter 123. Murnick v. Asbury Park, supra. Plaintiffs have not shown extreme or severe circumstances nor have they demonstrated that application of chapter 123 will leave them with confiscatory assessments.
Accordingly, as stated above, the court will determine the true value of each condominium unit under appeal and from that finding, will ascertain the ratio of assessment to true value and whether that ratio is beyond the upper or lower limit of the common level range. If the ratio is outside the common level range, in either direction, the court will fix the assessment by application of the Director’s ratio to the true value. If, on the other hand, the ratio of assessment to true value is within the common level range the assessment will remain unchanged.
The true value and the adjudicated assessment of each unit under appeal, determined in accordance with this opinion, are as *528 shown on an exhibit which is part of the file and is designated as Schedule “A.” Judgment will be entered for the assessment shown in the column headed “Tax Court Judgment.”
The association contends that the clubhouse is a common element and thus may not be separately assessed. Evaluation of the association’s position calls for a brief review of the relevant statute and the public offering statement.
By statute, ownership of a condominium unit includes a proportionate share of the common elements. N.J.S.A. 46:8B-3(h), (o), -6. Common elements must be assessed as part of the condominium units; they may not be separately assessed. Glenpoint Assocs. v. Teaneck Tp., 10 N.J.Tax 288 (Tax Ct. 1988). Common elements are defined in the statute to include “such other elements and facilities as are designated in the master deed as common elements.” N.J.S.A. 46:8B-3(d)(viii). Section 4.01(c) of the master deed, attached as an exhibit to the pos, includes recreation facilities among the common elements.
However, notwithstanding the pos and master deed designation of the clubhouse as a common element, the clubhouse, as distinguished from the other recreation facilities, is not a common element. The evidence shows that the building in which the clubhouse is located is owned by the association. Such separate ownership precludes qualification of the clubhouse as a common element, as by law, ownership of a unit is inseparable from ownership of its proportionate share of the common elements. The term “condominium” is defined in N.J.S.A. 46:8B-3(h) as “the form of ownership of real property under a master deed providing for ownership by one or more owners of units of improvements together with an undivided interest in common elements appurtenant to each such unit.” The term “unit” is defined in N.J.S.A. 46:8B~3(o) as “a part of the condominium property designed or intended for any type of independent use, ... and includes the proportionate undivided interest in the common elements....” N.J.S.A. 46:8B-6 provides, in pertinent part:
*529 The proportionate undivided interest in the common elements assigned to each unit shall be inseparable from such unit, and any conveyance, lease, devise or other disposition or mortgage or other encumbrance of any unit shall extend to and include such proportionate undivided interest in the common elements, whether or not expressly referred to in the instrument effecting the same. The common elements shall remain undivided and shall not be the object of an action for partition or division____
In Bonner Properties, Inc. v. Franklin Tp. Planning Board, 185 N.J.Super. 553, 449 A.2d 1350 (Law Div.1982) the court upheld a planning board denial of a developer’s proposal to separate ownership of common elements from ownership of condominium units “because the [developer’s] proposal envisions a form of property ownership that cannot be regarded as a species of condominium....” Id. at 566, 449 A.2d 1350.
Nor is there any basis in the record for a conclusion that the clubhouse has no independent value. On the contrary, the evidence indicates that Wedgewood Knolls unit owners do not have exclusive use of the clubhouse; residential unit owners of Wedgewood Plaza may also use the clubhouse upon payment of an annual fee. This factor alone vitiates a conclusion that the clubhouse has no independent value. Tower West Apt. Association, Inc. v. Town of West New York, 2 N.J.Tax 565 (Tax Ct.1981), aff’d o.b. per curiam 5 N.J.Tax 478 (App.Div.1982); Community Corp. v. Montague Tp., 9 N.J.Tax 398 (Tax Ct. 1987), aff’d o.b. per curiam 10 N.J.Tax 237 (App.Div.1988).
Accordingly, the separate assessment of the building in which the clubhouse is located is proper and, as no valuation proofs were submitted, the county board judgment upholding the 1989 assessment on Block 124, Lot 6J will be affirmed.