CRABTREE, J.T.C.
This is a local property tax case involving the troublesome issue of how a failed condominium should be valued. Plaintiff, the owner of 312 unsold units and 73 unsold garages in the condominium complex known as Brookdale Gardens, seeks review of a judgment of the Essex County Board of Taxation affirming the 1990 assessments on the unsold units and garages. While there is a disparity between the total assess *506 ments shown on the county board judgment and the total assessments set forth in plaintiff’s complaint, there is no dispute that the units and garages are separately assessed in accordance with N.J.S.A. 46:8B-19 as follows:
Unit Assessment
2.5 room apartment $ 8,600
3.5 " 10,800
4 " " 11,800
5 " . 14,600
Garage 800
The subject property is a former garden apartment complex located at 917-943 Broad Street, Bloomfield, New Jersey (Block 970, Lot 1). The improvements consist of 20 two-story and basement brick apartment buildings containing 392 one- and two-bedroom apartments and seven garage buildings of masonry construction containing 102 garages. The improvements were erected in 1949 and 1950.
Plaintiff purchased the property in January 1986 and undertook a conversion to condominiums in 1987. Approval of the conversion was not obtained from the New Jersey Department of Community Affairs (DCA) until April 1988; the master deed was not filed until January 1989. In 1987, while plaintiff’s application for approval of the conversion was pending before the DCA, plaintiff accepted non-binding reservations for 75 units and 27 garages. In April 1988, following DCA approval of the conversion, plaintiff transformed the non-binding reservations into binding contracts of sale for the 75 units. Closings commenced the following January and continued throughout the entire year 1989. All but five unit sales, plus one garage sale, were closed before July 1989. Only four unit sales and two garage sales were closed in all of 1990. No further sales have occurred, although plaintiff continues to advertise the units for sale.
All the purchasers were end users. They were either tenants in occupancy at the time of conversion who bought their own units or outsiders who rented vacant units with initially non *507 binding reservations to buy and subsequently purchased their rented units.
Of the 321 unsold units[1] on the assessing date 102 were occupied by tenants whose occupancy was protected by the Senior Citizens and Disabled Protected Tenancy Act, N.J.S.A. 2A:18-61.22 et seq., 130 were occupied by non-senior tenants whose occupancy was protected by the Anti-Eviction Act, N.J.S.A. 2A:18-61.1 et seq., and 87 were vacant. The remaining two units were used as an office and as an apartment for the superintendent.
At all times pertinent hereto a rent control ordinance was in effect in the defendant municipality. The ordinance contained a provision for vacancy decontrol, i.e., a vacant unit could be rented at the prevailing market level.
Plaintiffs expert estimated the true value of each of the occupied units by use of the income approach. She utilized the contract rents, subtracted the actual condominium maintenance charges (determined according to the size of the unit), estimated a 5% management fee and a 2% interior repair and maintenance expense, and applied a capitalization rate of 13.593% to the non-senior occupied units, and a capitalization rate of 13.-843% to the senior occupied units. The difference was in the equity component of the expert’s band of investment, mortgage-equity technique; she assumed an 11% equity dividend rate for the senior occupied units, compared to a 10% dividend rate for the non-senior occupied units. Both capitalization rates included an effective tax rate of 2.468%.
The expert also valued the vacant units by the income approach, estimating the true value to be $32,324 for 2.5-room units, $30,958 for 3.5-room units, $37,214 for four-room units and $39,993 for five-room units. In arriving at these conclusions of value she assumed economic rent of $560 a month for 2.5-room units, $590 a month for 3.5-room units, $685 a month *508 for four-room units and $755 a month for five-room units. She assigned a 15% vacancy rate to each vacant apartment and then subtracted the condominium maintenance charge attributable to each type of unit, a 5% management fee and a 2% interior repair and maintenance expense. She then capitalized the net income thus derived at 13.593%, including the effective tax rate of 2.468%, utilizing the band of investment, mortgage-equity technique.
The expert also utilized the sales comparison approach in valuing the units occupied by protected tenants. She began with the average selling price of each type of unit as reflected in the 75 sales that occurred prior to December 31, 1989, discounted for renovation costs of $10,000 for each unit, and applied a present value discount of 11.125% for four years in the case of non-senior occupied units and ten years in the case of senior occupied units. She did not include the present value of the income stream for the projected years of occupancy. These calculations produced value estimates of $34,756 for each 2.5-room unit, $43,347 for each 3.5-room unit, $57,691 for each four room unit and $70,036 for each 5-room unit.
Finally, the expert valued the unsold garages by the income approach. She capitalized the estimated cash flow from each garage, based primarily upon the actual rental less the condominium maintenance charges. She assigned a 30% vacancy rate only to those garages which were vacant. Her capitalization rate was 13.593%, including the effective tax rate of 2.468%.
The sale price of each of the 27 garages that sold prior to December 81, 1989 was $5,000.
Defendant’s expert ascribed values to the units according to their size as follows:
Size Unit Value
5-room units $110,000
4-room units 83,300
3.5- room units 76.500
2.5- room units 59.500
Garages 3,000
*509 In arriving at these conclusions the expert utilized only the sales comparison approach, relying upon the 75 sales that closed before December 31,1989. His values did not reflect the lapse of time between the execution of sales contracts and the assessing date, nor did he take into account the statutory protections afforded the tenants in occupancy when the subject property was converted from rental apartments to condominiums.
The first issue to be resolved is the highest and best use of the subject property. Highest and best use has been defined as:
The reasonably probable and legal use of ... an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.
[American Institute of Beal Estate Appraisers, The Appraisal of Real Estate (9th ed. 1987) at 269].
See also Chevron U.S.A., Inc. v. Perth Amboy, 10 N.J.Tax 114, 145 (Tax 1988), aff'd o.b., 237 N.J.Super. 280, 567 A.2d 597 (App.Div.1989), certif. denied, 121 N.J. 628, 583 A.2d 324 (1990).
Condominium units, whether constructed as condominiums or converted from rental apartments, are separately assessed for local property tax purposes. N.J.S.A. 46:8B-19. Residential condominiums are thus treated no differently from detached, owner-occupied single-family dwellings, which are customarily valued by the sales comparison approach. The income approach is generally inappropriate as such dwellings are not purchased for investment. Thus, the sale of 79 units to end users is a strong indication that the highest and best use of those units is for owner occupancy.
The evidence shows, however, that the highest and best use of the unsold units, i.e., the units under review, is for investment. One arrives at this conclusion almost by default. All but 87 units are occupied by protected tenants who, for a number of years, cannot be evicted except for non-payment of rent, so they cannot be sold for occupancy by the purchasers; they can only be sold to investors. By virtue of vacancy *510 decontrol, the 87 vacant units may be rented initially at prevailing market rents; the evidence indicates no market demand for those units as owner-occupied dwellings.
 The 75 sales to end users, under contracts executed in 1987 and 1988, are not probative of the value of the unsold units on the assessing date. To begin with, the interval between the execution of the sales contracts, pursuant to antecedent nonbinding reservations, and the assessing date (in many instances as long as two years), an interval which saw significant changes in market prices, casts serious doubt on comparability. See Glenpointe Assoc. v. Teaneck Tp., 241 N.J.Super. 37, 47, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990) (price fixed under 1977 contract of sale which closed in the first tax year, 1981, was too remote in time to provide reliable indication of value). Secondly, of the 75 sales closed in 1989, 28 were to existing tenants at reduced insider prices. Finally, the alleged comparables were devoted to a different highest and best use, namely, for occupancy by the purchasers. A proposed comparable lacks comparability if its highest and best use differs from that of the subject. Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153 (Tax 1988), aff'd, 12 N.J.Tax 244 (App.Div.1990), aff'd, 127 N.J. 290, 604 A.2d 580 (1992). Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison. Venino v. Carlstadt, 1 N.J.Tax 172 (Tax 1980), aff'd o.b. per curiam, 4 N.J.Tax 528 (App.Div.1981); Badische Corp. v. Kearny, 11 N.J.Tax 385 (Tax 1990).
For the reasons just given the court finds that the 75 condominium unit sales relied upon by defendant’s expert are not comparable.
The sales comparison approach utilized by plaintiff’s expert is likewise not probative of true value. The expert assumed a four-year occupancy for the non-senior tenants on the assessing date and, on that assumption, she discounted the hypothetical selling price to present value, using a discount rate *511 of 11.125%. While her projection of four years years from the date of DCA approval of the conversion) seems realistic given the duration of anti-eviction protection provided by N.J.S.A. 2A:18-61.2 and -61.11 (three years notice of intended conversion plus additional one-year stay of eviction unless landlord provides comparable housing, with maximum of five such stays), she fails to consider the present value of the rental income stream over the projection period. Put differently, the expert has valued only the reversion and omitted the value of the income stream. See The Appraisal of Real Estate, supra at 487-95.
Moreover, her starting point for the discounted value estimate was the average selling price of each type of unit as reflected in the 75 sales closed in 1989. The use of average sale prices is not an acceptable appraisal technique. Wedgewood Knolls v. West Paterson Boro., 11 N.J.Tax 514 (Tax Ct.1991).
Finally, her estimate of $10,000 in renovation expenses for all the occupied units is not supported by the record.
Her market approach for the senior occupied units suffers from the same shortcomings which burden her analysis of the non-senior occupied units with one additional defect, namely, the lack of support for the projected ten-year occupancy period. There is no evidence to indicate the ages of the seniors, nor for that matter, whether any of the tenants are disabled; nor is there any evidence of turnover rates such as those found in Schwam v. Cedar Grove Tp., 9 N.J.Tax 406 (Tax 1987), aff'd, 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), certif. denied, 115 N.J. 76, 556 A.2d 1219 (1989).
The court finds that the income approach is the most probative of true value (except for the garages, the valuation of which will be addressed below) and the economic rent posited by the expert for the vacant units is supported by the evidence. However, the income approach utilized by plaintiffs expert with respect to the occupied units is not persuasive.
*512 To begin with, she uses contract rents as economic rent for the non-senior occupied units. This assumes an indefinite continuation of those rents. Yet, the statutory protection extends, at a maximum, for only eight years after conversion to condominium status. On the assessing date, approximately two years of the protection period had expired. Furthermore, the landlord, after one stay of eviction, may terminate the protected tenancy by waiving five months rent, N.J.S.A. 2A:18-61.11, thereby substantially curtailing the protection period.[2] Given the fact that only 11 units out of 130 occupied by non-senior protected tenants pay rent at least equal to the expert’s economic rent estimated for the vacant units, and also given the fact that vacancy decontrol in the defendant municipality permits a landlord to charge market rents for vacant apartments, good management requires that the landlord terminate the protected tenancies by waiving five months rent, thereby reducing the protection period to 4% years (three-year eviction notice upon conversion, one one-year stay of eviction and six months rent-free occupancy).[3] On the assessing date three years remained of the reduced protection period.
Accordingly, the court finds the economic rent for the non-senior protected units to be the same as the vacant units, viz: $6,720 for the 2.5-room units, $7,080 for the 3.4-room units, $8,220 for the 4-room units and $9,060 for the 5-room units.
The occupancy of the senior tenants is protected by the Senior Citizens and Disabled Protected Tenancy Act, A. 1981, c. 226, N.J.S.A. 2A:18-61.22 et seq. Under that legislation eligible tenants, i.e., those 62 years of age or older with household *513 incomes not exceeding the greater of three times the average per capita income in the county or $50,000, may remain in occupancy for 40 years from the date of conversion recording, which is the date of the filing of the master deed for a condominium or the first deed of sale to a purchaser of an individual unit. N.J.S.A. 2A:18-61.24, -61.25, -61.32. During the protected tenancy period the senior-occupied unit remains subject to rent control if the municipality has a rent-control ordinance. N.J.S.A. 2A:18-61.28.
It is thus apparent, as this court has previously found, that the statutory protections given to qualified senior citizens have an impact on the market value of condominium units occupied by them. Schwam v. Cedar Grove, supra. If the evidence in this case indicated that the estimated duration of occupancy of the senior tenants coincided with the remaining economic life of their units, plaintiff’s expert would be justified in using the contract rents of the senior occupied units as the economic rent. The evidence, however, does not so indicate.
Thus, the economic rent for the senior occupied units is not the contract rent for each such unit. In the absence of contrary proofs, the court finds the economic rent for the senior occupied units to be the same as the economic rent for the non-senior occupied units and the vacant units.
The court finds the expert’s 15% vacancy rate reflects merely the current parlous state of the residential market. It does not reflect the long-term quality and durability of the income stream, as required by sound appraisal principles. See Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax 1980). The court finds a 10% vacancy allowance to be more realistic, given the characteristics of the subject units and the demographic composition of the tenant population.
The expenses posited by the expert are reasonable and realistic. The largest item, namely, the condominium maintenance expense, is the actual amount charged by the condominium association. The expert’s capitalization rate is supported by data in her appraisal report. However, the slightly higher *514 equity dividend rate for the senior units is not supported by the proofs, as the expert failed to establish the anticipated duration of occupancy of the senior units.
In view of the foregoing, the court finds the true value of the unsold units, determined under the income approach, to be as follows:
2.5 rooms 3.5 rooms 4 rooms 5 rooms
Rent $6,720 $7,080 $8,220 $9,060
Vacancy & Loss (672) (708) (822) (906)
Effective gross income 6,048 6,372 7,398 8,154
Less expenses:
Condo. mgmt. fee $918.36 $1,338.64 $1,439.40 $1,725.72
5% mgmt.
fee 302.40 318.60 370.00 407.70
2% interior maintenance 120.96 1,341.72 127.44 1,784.68 147.96 1,957.36 163.08 2,296.50
Net operating income $4,706.28 $4,587.32 $5,440.64 $5,857.50
Capitalized at 13.593%
True value $34,622 $33,747 $40,025 $43,092
SAY $34,600 $33,800 $40,000 $43,100
The consideration for the 1988-1989 sales of the 27 garages was $5,000 for each garage. From the absolute uniformity of sale price it is apparent that the market for the garages was not affected by the status of the purchasers of the units to which the garages pertained. Thus, existing tenants who purchased their units for insider prices paid the same price for garages as the outsiders who paid, in many cases, higher prices for units of the same size. Moreover, there is no evidence of a decline in value of the garages from the contract sale dates to the assessing date.
*515 Accordingly, the court finds the true value of each of the unsold garages to be $5,000.
The general average ratio, duly promulgated by the Director, Division of Taxation for defendant taxing district for tax year 1990, was 18.12%. The lower and upper limits of the common level range were, respectively, 15.40% and 20.84%.
The relevant statute, N.J.S.A. 54:51A-6(a), provides that whenever the ratio of assessed to true value, as found by this court, exceeds the upper limit or falls below the lower limit of the common level range, the court shall revise the property’s taxable value by applying the average ratio to the true value as found.
The ratio of assessed to true value for all the unsold condominium units (excluding the garages) exceeds the upper limit of the common level range. Thus, the court finds the proper assessments for such units to be:
2.5 rooms 3,5 rooms 4 rooms 5 rooms
Land $3,000 $3,000 $3,000 $3,500
Improvements 3,300 3,100 4,200 4,300
Total $6,300 $6,100 $7,200 $7,800
The ratio of assessed to true value for each garage under review is 16%. As this ratio lies within the common level range there will be no change in the assessments on the garages.
Counsel for plaintiff will submit a schedule, suitable for attachment to a judgment, setting forth the number of each unit, the CO number, the original assessment and the assessment determined in this opinion.

 Nine units were sold between the assessing date and the filing of the complaint. None of the purchasers is a party to this proceeding.

 The consecutive one-year stays, up to five, are for the purpose of locating comparable housing. Inasmuch as Bloomfield has vacancy decontrol, comparable housing within the municipality does not exist, as occupied apartments are rent controlled and vacant apartments are not. One of the comparability factors is rent. N.J.S.A. 2A:18-61.7(a).

 In addition to the waiver of five months rent, a protected tenant is entitled, in any event, to waiver of one month's rent as moving expense compensation. N.J.S.A. 2A:18-61.10.