CRABTREE, J.T.C.
This local property tax case involves an omitted assessment for 1986 and the regular assessment for 1987. The principal issue is the taxable status of certain machinery and equipment utilized in hydroelectric power generation. The other issues are the timeliness of the omitted assessment and the true value of the property involved, assuming the court finds the machinery and equipment to be real property in accordance with the standards set forth in N.J.S.A. 54:4-1, as amended by L.1986, c. 117.
*15 The property is identified as Block 3.14, Lot 9 on the Clifton tax map. The omitted-added assessment, made in 1987 for part of 1986, was $1,185,600, pro-rated for eight months at $790,400. The regular assessment for 1987 was:
[[Image here]]
The Passaic County Board of Taxation affirmed the omitted-added assessment for 1986; the 1987 assessment was the subject of a direct appeal pursuant to N.J.S.A. 54:3-21.
Plaintiff is a limited partnership which owns and operates a hydroelectric power generation plant on land leased from Dundee Water Power and Land Company. The lease requires plaintiff to pay all real estates taxes imposed on the improvements installed on Dundee’s land. The project providing for the installation of the subject is known as the Dundee Project and it was financed, along with another project known as the Warrior Ridge Project, through the sale of limited partnership interests and a mortgage loan from Connecticut Bank & Trust Company.
The Dundee Project was established to generate hydroelectric power for sale to Public Service Electric & Gas Company. The impetus for the project was the 1978 enactment of federal legislation, i.e., the Public Utility Regulatory Policies Act, 16 U.S.C.A. § 2601 et seq. (PURPA), requiring electric utilities to purchase power from small hydroelectric plants. Also, effective January 1, 1980, the Federal Internal Revenue Code was amended to provide for an 11% energy credit for certain hydroelectric power equipment, to extend application of the 10% investment tax credit to specified hydroelectric power equipment and to make such equipment eligible for five-year accelerated depreciation deductions.
Hydroelectric power is generated by the flow of water from one elevation to another and the passage of the water through plaintiff’s equipment. The water flows down the Passaic River, passes through a trash rack, which collects debris, and enters a canal. The water then flows through intake conduits and pipes *16 and turns a turbine propeller. Connected to the propeller is a shaft which is within a pipe leading to a water-tight generator, which is turned by the turbine shaft, which is turned by the water. The water then exits through draft tubes submerged in the river. An earthen embankment, which houses certain items of equipment, separates the canal from the river. Steel sheeting stabilizes the embankment.
The Dundee Project was installed by Conduit & Foundation Corporation, the parent company of C & F Hydro Corporation, one of plaintiffs two general partners. The hard costs of the project including the cost of the equipment, its installation and the site work, totaled $2,875,000. Of this amount, $184,770 was attributable to site work, which includes dam structures, foundation pads, landscaping and site-preparation costs such as clearing and erosion protection.
The equipment which makes up the hydroelectric generation plant consists of bell mouth intake conduits, steel pipes, butterfly valves, reducing elbows, turbine generator units, draft tubes, a trashrack, a control enclosure, a power transformer, a utility metering panel, a circuit breaker and a steel frame with disconnect switches and lightning arrestors. All of these items are attached to each other and/or to concrete foundation pads by flanges and bolts. The equipment was specifically designed to be easily removable and, in fact, has been removed in the past. The removal of this type of equipment can be effected quickly and inexpensively. Removal entails disconnecting wires and cables, unbolting the pieces of equipment from each other and from the foundation pads and lifting the equipment away by mobile crane.
I.

The Omitted Assessment.

On November 13, 1986, defendant’s assessor filed with the Passaic County Board of Taxation an added-assessment list which included an added assessment for the subject property of $1,185,600, pro-rated for eight months of 1986. The county *17 board certified defendant’s added-assessment list on November 14, 1986. On or about December 11, 1986 plaintiff’s lessor, Dundee Water Power and Land Company (Dundee), received an undated tax bill pertaining to the added assessment. The due date of the tax shown on the bill was December 31, 1986.
By letter of December 16, 1986, the Director, Division of Taxation extended[1] the time for filing appeals from defendant’s added or omitted assessments to the Passaic County board to December 31, 1986. The county board, in turn, notified defendant’s assessor of the extension by letter of December 18,1986, but neither Dundee nor plaintiff received notice of the extension prior to December 31, 1986. Plaintiff, having learned of the extension after the latter date, applied to the county board on or about February 3, 1987 for a further extension of the appeal time but its application was denied.
On February 17, 1987, plaintiff filed a complaint with this court seeking invalidation of the added assessment for non-compliance with the added-assessment statutes. On June 25, 1987 this court denied defendant’s motion to dismiss for untimely filing and declared the added assessment invalid for failure to comply with the added-assessment statutes. American Hydro-power Partners v. Clifton, 9 N.J.Tax 259 (Tax Ct.1987). The Appellate Division affirmed on January 23, 1989. American Hydropower Partners v. Clifton, 239 N.J.Super. 130, 570 A.2d 1246 (App.Div.1989).
After this court invalidated the 1986 added assessment defendant’s assessor, on September 29, 1987, notified plaintiff that such assessment was under consideration as an omitted-added assessment for 1986. At the time plaintiff was so notified, this court’s decision was on appeal. On October 28, 1987 the assessor filed an omitted-assessment list with the county board, which included an added assessment on the subject property for 1986 in the same amount as the invalidated added assessment. *18 Defendant’s tax collector received the certified omitted-assessment list from the county board on November 4, 1987. Dundee received the tax bill for the omitted-added assessment on November 16, 1987.
On or about December 1, 1987 plaintiff filed an appeal with the county board, which affirmed the omitted-added assessment on or about December 29, 1987. Plaintiff’s complaint seeking review of the county board judgment was filed with this court on January 29, 1988.
There are two methods by which omitted property may be assessed. Under the first method the county board makes the assessment upon application of the tax collector or any taxpayer of the taxing district or of its governing body or upon the county board’s own motion. Upon notice to the property owner a summary hearing is conducted and the county board then enters judgment in accordance with the proofs. N.J.S.A. 54:4-63.12, -63.13, -63.14.
On October 1 of the year in which the county board has rendered one or more judgments assessing omitted property for the current year or the preceding year the assessor of each affected taxing district files an omitted-assessment list with the county board which certifies it by October 10. N.J.S.A. 54:4-63.17. The certified list is then delivered to the tax collector of each affected taxing district, and that officer is required to send omitted assessment tax bills to the property owners at least one week prior to November 1. N.J.S.A. 54:4-63.19. County board judgments assessing omitted property may be appealed to the Tax Court in accordance with the State Tax Uniform Procedure Law (45 days after service of the county board judgment, N.J.S.A. 54:51A-la; R. 8:4-1(a)(2)), N.J.S.A. 54:4-63.23.
Under the second or alternate method, the assessor makes the omitted assessment. N.J.S.A. 54:4-63.31. On October 1 of the year in which omitted property is assessed the assessor must file his omitted assessment list with the county board, which then must certify it and return a duplicate thereof to the *19 assessor and tax collector by October 10. N.J.S.A. 54:4-63.32. Upon receipt of the certified list, the assessor is required to notify the owner of each property affected that an omitted assessment has been made. N.J.S.A. 54:4-63.35. The tax collector is required to send omitted assessment tax bills to the owners of affected property by October 25. N.J.S.A. 54:4-63.-36. Appeals from the assessor’s omitted assessments must be made to the county board no later then December 1 and the county board must hear (and presumably decide) all such appeals within one month after the filing deadline. Appeals to the Tax Court from county board judgments pertaining to omitted assessments must be filed within 45 days from the date fixed for final decisions by the county board on appeals from the assessor’s omitted assessments. N.J.S.A. 54:4-63.39.
Defendant chose the second or alternative method. The evidence does not indicate precisely when the omitted assessment was made but the assessor’s letter to plaintiff of September 29,1987 indicated that the assessment was under consideration. The only inference that can be drawn from this letter is that the omitted assessment, which had been by then invalidated as an added assessment by this court, had not actually been made by September 29, 1987. The list of omitted assessments made by defendant’s assessor, including the omitted-added assessment in dispute, was not filed with the Passaic County board until October 28, 1987, almost four weeks after the deadline for such filing imposed by N.J.S.A. 54:4-63.32. The same statute requires the county board to examine, revise and correct the omitted assessment list and return a certified duplicate thereof to the tax collector by October 10. This was not done until November 4, 1987; and Dundee did not receive a bill from the collector until November 16, 1987.
Thus, none of the statutory requirements dealing with omitted assessment procedures was met by defendant. There is no proof that the omitted-added assessment was made prior to October 1; indeed, it seems unlikely given the letter of defendant’s assessor indicating that the assessment was still under consideration as late as September 29, 1987. In any event, *20 irrespective of when the assessment was actually made, the list was not submitted to the county board until almost four weeks after the statutory deadline for submission. The delay of defendant made it impossible for the county board and the tax collector to comply with their respective statutory deadlines for returning the certified list and mailing the tax bills.
Defendant asks this court to overlook the wholesale disregard of each and every statutory deadline on the ground that plaintiff could reasonably anticipate the assessment, especially in view of this court’s observation in the first case that the failure to follow statutory procedures in making the original added assessment could be rectified through an omitted-added assessment. 9 N.J.Tax at 264. Indeed! By the same token, defendant was also aware of the need for corrective action, as this court’s decision was published on July 13, 1987, giving defendant ample time to impose an omitted-added assessment in accordance with the law.
Defendant also justifies its late submission of the list by resort to the regnant, hi-tech alibi of computer malfunction. (“The computer is down.”) To be sure, the evidence submitted by plaintiff shows that 14 of the 16 municipalities in Passaic County, including defendant, submitted their omitted assessment list on October 28, 1987. The other two taxing districts, Passaic City and Wayne Township, submitted their list on October 9, 1987.
The responsibility for submitting an omitted-assessment list to the county board by a specified date is imposed by law upon the taxing district. The law makes no exception for computer malfunction. It was incumbent upon defendant’s assessor to prepare the list manually, if need be, just as assessments lists were prepared prior to the advent of today’s sophisticated technology.
Finally, defendant argues that, unlike the first case, plaintiff was not prejudiced by the delay as its appeal was filed with the county board prior to December 1, 1987, the filing deadline imposed by N.J.S.A. 54:4-63.39. The argument is unsound. *21 The statutes contemplate completion of all omitted assessment procedures by November 1 so that the affected property owner has one month to consider whether to appeal the assessor’s decision. If defendant’s logic were to be followed, its failure to comply with statutory deadlines could be overlooked so long as some time remained for the property owner to file an appeal. The court, in the event the appeal was filed late, would be obliged to determine whether the property owner had been afforded a reasonable opportunity to appeal the omitted assessment. The Legislature, however, has ordained an orderly procedure, established by fixing objective dates for the steps required, including the date for filing an appeal.
Defendant relies on Haddon Hills Apts. North v. Haddon Tp., 31 N.J.Super. 124, 105 A.2d 916 (App.Div.1954) in support of its position. That case, however, is distinguishable. The omitted assessment list was filed three days late, not 27 days late; all required actions were completed by November 1, so the taxpayer had a full 30 days for an appeal. In the instant case, all actions were by no means completed by the latter date. Finally, the appeal was not filed until one year after the deadline.
The omitted-assessment procedures must be followed. The Legislature has laid down an orderly sequence of dates by which specific actions must be taken, beginning with the date the assessor submits the omitted-assessment list to the county board and ending with the dates by which appeals must be filed with the county board and decided by that tribunal. The time sequence is necessarily compressed into three calendar months in view of the need for a prompt disposition of actions so intimately related to municipal budgets and revenues.
It is well settled that a filing deadline for a tax appeal is jurisdictional, and its observance is a categorical judicial imperative. Newark v. Fischer, 3 N.J. 488, 70 A.2d 733 (1950); Suburban Department Stores v. East Orange, 47 N.J.Super. 472, 136 A.2d 280 (App.Div.1957); Mayfair Holding Corp. v. North Bergen Tp., 4 N.J.Tax 38 (Tax Ct.1982). The same *22 principle applies to taxing districts. Failure to observe statutory timelines for omitted or added assessments invalidates those assessments. American Hydropower Partners v. Clifton, supra; Chevron U.S.A. Inc. v. Perth Amboy, 9 N.J.Tax 571, 578 (Tax Ct.1988).
If, as Justice Holmes said, “[citizens] must turn square corners when they deal with the Government,” Rock Island, A. & L.R. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920), it behooves government to behave with corresponding rectitude toward its citizens. See also FMC Stores Co. v. Morris Plains Boro. 100 N.J. 418, 426, 495 A.2d 1313 (1985).
The omitted added assessment for 1986 is invalidated.
II.

The 1987 Regular Assessment.

A.

Real Property v. Personal Property.

N.J.S.A. 54:4-1, as amended by L.1986, c. 117, provides pertinently:
Real property taxable under this chapter ... includes personal property affixed to the real property or an appurtenance thereto, unless: a. (1) The personal property so affixed can be removed or severed without material injury to the real property;
(2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
(3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property____
Two aspects of this statute are significant. First, the exclusion requirement is conjunctive, i.e., it must be established both that the property is removable without material injury either to the real property or to the removed property itself, and that the personal property affixed is not ordinarily intended to be permanently affixed. Failure of the proponent of the exclusion to establish both elements results in taxation of the affixed property as real property. Chevron U.S.A. Inc. v. Perth Am- *23 boy, 9 N.J.Tax 205, 242-244 (Tax Ct.1987). Put differently, if there is a failure to establish that the affixed property was not ordinarily intended to be permanently annexed then its removal without material injury is irrelevant. N.Y.T. Cable TV v. Audubon Boro., 230 N.J.Super. 530, 536, 553 A.2d 1368 (App. Div.1989). Secondly, the focus is on the ordinary intention regarding permanent annexation with regard to property of the type in issue, not the actual intention of the owner of the particular property before the court. N.Y.T. Cable TV v. Audubon Boro, 9 N.J.Tax 359 (Tax Ct.1987), aff'd 230 N.J.Super. 530, 553 A.2d 1368 (App.Div.1989).
With the foregoing statute and case law as the framework the court will now address the evidence concerning the property in dispute insofar as it pertains to the 1987 regular assessment.
Plaintiff concedes that the concrete foundation pads and the steel pipes embedded in the canal wall cannot be removed without material injury to the property involved, i.e., the concrete foundation pads and the concrete foundation wall. Thus, plaintiff concedes that such items are taxable as real property.
As to the rest of the items in dispute the uncontroverted testimony of plaintiffs expert, William Pentin, an engineer with extensive experience in the design of hydroelectric power plants, indicates that such items can all be removed without material injury either to the items removed or to the real property to which the items were attached. On the basis of the expert’s credible testimony the court finds that all the items in dispute except the concrete foundation pads and the 11 steel pipes embedded in the concrete canal wall can be removed without material injury as that term has been defined in decisional law. Bayonne v. Port Jersey Corp., 79 N.J. 367, 399 A.2d 649 (1979); Chevron U.S.A. Inc. v. Perth Amboy, supra at 233-241.
As stated above, however, the proponent of the statutory exclusion as to property affixed to real property must not only prove that the property can be removed without material injury *24 but also that the property in question is of the type that is not ordinarily intended to remain permanently affixed.
Plaintiffs evidence on the issue of permanent annexation was also proffered through Pentin. That expert testified that it is the practice in the hydropower industry to move equipment from one site to another; that the trend in that regard has accelerated in frequency in recent years and that the market for both new and used hydropower equipment increased sharply after the passage of PURPA in 1978. However, Pentin went on to state that equipment was moved from one site to another when the volume of water changed, either through upstream diversion or because of a change in rainfall, or when small hydro plants owned by large utilities were abandoned because their continued operation was no longer economically feasible. When he was asked on cross-examination if he knew the intentions of hydropower plant owners to sell plants that met expectations and made money he replied that that was beyond his expertise, that he was unable to address questions of economics, raising investment capital and negotiation of contracts.
Moreover, Pentin did not know of a single instance where a functioning hydroelectric plant had been totally removed and transported to another site. His knowledge was limited to the existence of a market for the sale of some of the items that comprise the plant.
The expert’s testimony falls short of establishing that the items in issue are not ordinarily intended to remain permanently affixed to real property. The probative value of an expert’s opinion rests entirely upon the facts and reasoning offered in support of it. Dworman v. Tinton Falls Boro., 1 N.J.Tax 445 (Tax Ct.1980), aff’d o.b. per curiam 180 N.J.Super. 336, 3 NJ.Tax 1, 434 A.2d 1134 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1982).
In addition, plaintiff’s president, Peter McGrath, testified that the market demand for small hydroelectric power plants such as the plant in issue took a sharp drop with the passage of 1986 Tax Reform Act, which virtually eliminated tax shelters. Tax *25 benefits in the form of accelerated depreciation deductions and investment tax credits which could be passed through to partners of a limited partnership and used to offset their other income had been a substantial inducement to raising the investment capital required for hydroelectric power projects. As of the assessing date for tax year 1987 those tax inducements were no longer available. Thus, the court may infer — and it does infer — that, viewed as of October 1, 1986 the decline in market demand for used hydroelectric power equipment strongly militates against a conclusion that such equipment is not ordinarily intended to be permanently annexed to real property.
Plaintiff bears the burden of proving, by the preponderance of the evidence, that the machinery and equipment in issue are not ordinarily intended to remain permanently affixed to real property. For the reasons stated above, plaintiff has not met that burden. The court is not obliged to make an affirmative finding that the property in question is ordinarily intended to be permanently annexed to the real property. Accordingly, all the items in issue will be treated as real property taxable pursuant to N.J.S.A. 54:4-1.
B.

Valuation.

Plaintiffs valuation expert estimated the true value of the subject property, including an extrapolated land value for three parcels, only one of which is before the court, to be $833,500 on October 1, 1986 for tax year 1987. In reaching this conclusion he placed sole reliance on the income approach, confining that approach to the value of the improvements. (He testified that his assignment was limited to estimating the true value of the improvements.) His economic gross income of $220,738 was derived entirely from actual sales of electric power for the 12 months ended December 31, 1987.
He estimated expenses for the same period at $153,728, which included $10,063 in land rent paid to Dundee. The difference between economic gross income and expenses result *26 ed in net operating income of $67,010, which he annualized for the period March 16, 1986 to December 31, 1987 at $48,300[2], which he then capitalized at 13.28%, using the mortgage-equity band of investment method. This exercise produced a value estimate of $363,700 for the improvements. He then added $469,800 for the land value, a figure derived by dividing the land assessments totaling $165,000 by the Director’s ratio of 35.12%. He proffered no comparable land sales or any other evidence in support of his estimate of land value.
Although the expert acknowledged on cross-examination that the subject of his appraisal, namely, a hydroelectric power plant, was special-purpose property, he declined to consider the cost approach.
The court rejects the expert’s opinion of value. To begin with, his income approach, upon which he places exclusive reliance, employs the income from the business, not the property. Real property valuation, for local property tax purposes, cannot be based solely upon gross sales from a business conducted on the real property involved. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 108-109, 89 A.2d 385 (1952); McCrory Stores v. Asbury Park, 89 N.J.Super. 234, 214 A.2d 526 (App. Div.1965). Second, his inclusion of a land rent expense item is inconsistent with the requirement that the entire property, including all interests therein, be valued in fee simple. Stack v. Hoboken, 45 N.J.Super. 294, 132 A.2d 314 (App.Div.1958). Third, the expert failed to value the land. He merely extrapolated value from the land assessment, applying the Director’s general average ratio to that assessment. The entire value of the property, both land and the improvements thereon, must be established in a tax valuation proceeding. In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961).
*27 Plaintiff cites Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) in support of the expert’s land valuation technique. In that case, however, the Supreme Court upheld the extrapolation technique utilized by the taxpayer’s expert (i.e., the land assessment divided by the average ratio) in the context of the building residual technique of income capitalization. Under this technique separate rates of return must be calculated for the land and the improvements, as the improvements are subject to a recapture rate, whereas the land is not.
The rationale of Glen Wall is inapposite in the case before this court for two reasons. First, unlike the situation in Glen Wall, land value is in issue here notwithstanding plaintiff’s apparent concession. Second, the expert employed the mortgage-equity technique, not the building residual technique; and the former involves a total capitalization rate derived from two weighted components. The capitalization rate is applied to the net operating income to arrive at a value estimate for the entire property, land and building merged. Plaintiff’s expert did not follow this procedure. He confined the mortgage-equity capitalization technique to the improvements, to which he added a land value without a scintilla of credible evidence to support it.
Finally, while conceding that the hydroelectric power plant was special purpose in character, the expert declined to use the cost approach. It is well settled in this State that ordinarily the cost approach is the most reliable method for valuing special-purpose property for tax assessment purposes. Transcontinental Gas v. Bernards Tp., 111 N.J. 507, 545 A.2d 746 (1988). I find that approach to be appropriate here.
Defendant’s expert estimated the true value of the subject property, both land and improvements, to be $4,191,000 on October 1, 1986 but this included the land value of three parcels, only one of which is before the court, viz., Block 3.14, Lot 9. His value estimate for the improvements, all of which are located on the parcel under review, was $2,875,000. He valued all the land at $100,000 an acre. The land under review *28 contains 2.39 acres, so his land value for the subject parcel is $239,000.
The expert recognized that the hydroelectric power plant was special-purpose property and he accordingly relied solely upon the cost approach in valuing the improvements. His cost estimate was predicated upon the recently incurred actual costs of those improvements; his land value estimate was supported by five comparable sales of vacant land. All sales took place in reasonable proximity to the assessing date and involved only properties within the defendant municipality.
The expert’s value estimate is supported by the credible evidence in the record. Recently incurred actual costs of improvements are evidentiary and may be considered in valuing real property under the cost approach for tax valuation purposes. Bostian v. Franklin State Bank, 167 N.J.Super. 564, 401 A.2d 549 (App.Div.1979), on remand 1 N.J.Tax 270 (Tax Ct.1980), aff’d o. b. per curiam 179 N.J.Super. 174, 2 N.J.Tax 391, 430 A.2d 1140 (App.Div.1980). See Abe Schrader Corp. v. Secaucus, 8 NJ.Tax 390, 394 (Tax Ct.1986). The expert’s comparable land sales offer convincing probative support for his land value estimate. The probative utility of an expert's opinion depends upon the facts and reasoning offered in support of it. Dworman v. Tinton Falls Boro., supra.
In view of the foregoing I find that the true value of the subject property on October 1, 1986 to be:
[[Image here]]
The general average ratio for defendant taxing district for tax year 1987, as promulgated by the Director, Division of Taxation, was 35.14%. The upper and lower limits of the common level range, also as promulgated by the Director, were 40.41% and 29.47%, respectively. The ratio of true value as herein found to the assessment is 40.18%, which is within the common level range.
*29 Accordingly, the assessment is affirmed and judgment will be entered in accordance with this opinion.

 The Director’s power to grant the extension was not raised as an issue in this case.

 The expert averaged net income for the period March 16, 1986, the date operations commenced, to December 31, 1986 and net income for calendar year 1987.