SMALL, J.T.C.
The plaintiff, NBCP Urban Renewal Partnership, seeks a declaratory judgment determining the amount of the annual service charge in-lieu-of taxes owed by the plaintiff to the defendant, City of Newark, as well as a refund of excess payments made pursuant to the Urban Renewal Corporation and Association Law of 1961 (the Fox-Lance Act). N.J.S.A. 40:55C-40 to -76.[1] The matter is before me on plaintiffs motion and defendant’s cross-motion for summary judgment. R. 4:46.
*63 The parties agree that the annual service charge in-lieu-of taxes should be two percent of total project cost, but disagree as to whether the total project cost should include the cost of certain turbines and other related machinery and equipment used in the generation of electricity and thermal energy (the “Turbines”). Resolution of the issue depends on the effect, if any, of the enactment of the Business Retention Act (the “BRA”), L. 1992, c. 24, amending N.J.S.A. 54:4-1, on the terms of the tax exemption granted to the plaintiff by a July 1991 resolution of the Newark City Council and an August 1991 contract (the “Financial Agreement”) with the City of Newark implementing that resolution. For the reasons expressed below, I find that the total project cost should include the cost of the Turbines.
Plaintiff is organized as an urban renewal entity under N.J.S.A. 40:55C-55.1. Plaintiff is the tenant at the property identified as Block 5060, Lots 153.01 and 153.03 on the tax map of the City of Newark, commonly known as 449 Doremus Avenue and 414-434 Avenue P. Plaintiff is responsible for the payment of taxes on the leased property. On June 28,1991, prior to commencing construction on those lots, plaintiff applied to the defendant for an exemption from real property taxes pursuant to N.J.S.A. 40:55C-58.[2] *64 The proposed project involved the construction of an approximately 59,600 square foot cogeneration facility that simultaneously produces electricity and thermal energy. On July 2, 1991, the Newark City Council approved, by resolution, plaintiffs exemption application.
On August 16, 1991, the parties entered into the Financial Agreement pursuant to N.J.S.A 40:55C-59 which provided for plaintiff to construct the cogeneration facility and receive a 15-year exemption from real property taxes on the improvements from the date of the issuance of the certificate of occupancy. Construction of the facility began on August 20, 1991, and the certificate of occupancy was issued on June 10, 1993. In lieu of real property taxes on the improvements, plaintiff agreed to pay an annual service charge to the defendant, as provided by N.J.S.A 40:55C-65,* *[3] to be calculated as two percent of the “total project cost,” as defined by N.J.S.A 40:55C-47.[4]
*65 At the time the Financial Agreement was executed, the parties determined that the Turbines were to be included in the agreement as part of the calculation of the total project cost and the annual service charge. Accordingly, the parties estimated the total project cost at $50,082,500 (which would result in an annual service charge of $1,001,650) and which included $28,750,000 for the cost of the Turbines. The total project cost and annual service charge figures were incorporated into the Financial Agreement.
After the execution of the Financial Agreement, but prior to the completion of the subject facility and the issuance of the certificate of occupancy, the Legislature amended N.J.S.A. 54:4-1 through the passage of the BRA. L. 1992, c. 24. This act, applicable prospectively from June 26,1992, and to all tax appeals pending as of that date, excluded from real property taxation certain personal property used or held for use in business. L. 1992, c. 24, § 7; General Motors Corp. v. City of Linden, 150 N.J. 522, 696 A.2d 683 (1997), aff'g 293 N.J.Super. 99, 679 A.2d 718 (App.Div.1996), rev’g 17 N.J.Tax 1 (Tax 1996). The parties have stipulated, for purposes of this litigation, that the Turbines would have been taxable as real property prior to the enactment of the BRA. Badische Corp. v. Town of Kearny, 11 N.J. Tax 385 (Tax 1990); *66 Texas E. Transmission Corp. v. Dept. of the Treasury, Div. of Taxation, 11 N.J. Tax 198 (Tax 1990); American Hydro Power Partners v. City of Clifton, 11 N.J. Tax 12 (Tax 1990), aff'd in part and rev’d in part, 12 N.J. Tax 264 (App.Div.1991). They also have agreed that, for purposes of this litigation, the Turbines are not taxable as real property under the BRA.
Pursuant to the Financial Agreement, plaintiff engaged Deloitte & Touche, LLP, to prepare an audit of plaintiffs total project cost upon the project’s completion, which the agreement provided would supersede, upon approval by the City of Newark, the initial estimate provided in plaintiffs abatement application and the Financial Agreement. The audit report was completed on January 31, 1994, and was reviewed by the defendant’s Division of Special Taxes. Eventually, following a reformatting of the report and an upward adjustment for developer’s fees, a total project cost was established of $18,061,230 (which would result in an annual service charge of approximately $361,000). This figure specifically excluded the cost of the Turbines.
Since July 1, 1993, when the annual service charge payments began, the defendant municipality has billed the plaintiff for in-lieu-of tax payments based on a total project cost of $50,082,500. Plaintiff is required to make these payments to avoid default under its loan agreement, and has made all such payments.
Plaintiff argues that the passage of the BRA has altered the terms of the Financial Agreement. Plaintiff asserts that only taxable improvements may be used as the basis for calculating total project cost that is subject to the annual service charge, and that the amendment to N.J.S.A 54:4-1 eliminated the Turbines from real property taxation, and thus from the calculation of total project cost. Plaintiff relies on one section in the Financial Agreement to support its argument. Section 14.1 of the Financial Agreement reads as follows:
The Entity hereby agrees at all times prior to the expiration or termination of this Financial Agreement to remain bound by the relevant provisions of the Federal and State Statutes and Municipal Ordinances and Regulations including but not limited to N.J.S.A 40:55C-40, et. seq., and the provision of the City of Newark’s R.O. 10:13-1, et. seq., as amended and supplemented. In the event that *67 said laws are amended or revised then the Entity shall be subject to the new legislation. The Entity’s failure to comply with such statutes or ordinances shall constitute a violation and breach of the Financial Agreement and the City shall, among its other remedies, have the right to terminate said tax abatement.
[(Emphasis added).]
Plaintiff notes that, at the time of completion of the improvements, when the calculation of the total project cost was to be made, the BRA was the law. As such, plaintiff concludes that the correct figure for the total project cost is $18,061,230, which excludes the cost of the Turbines. Defendant asserts that the taxability or non-taxability of the Turbines is irrelevant to determining whether such improvements constitute part of the total project cost for calculating the annual service charge. Defendant claims that the definition of total project cost which is the basis of the annual service charge makes no reference to N.J.S.A. 54:4-1, and thus there is no requirement that the total project cost include only otherwise taxable improvements.
Two issues have been presented for my determination: (1) whether N.J.S.A. 54:4-1 and N.J.S.A 40:55C-40 to -76 must be read together such that the definition of “improvements” is the same in each statute and in each relevant section; and (2) whether the parties contracted to change the definition of “total project cost” in the Financial Agreement upon the subsequent passage of the BRA.
The nature of the dispute between the parties is made clearer by an examination of the dollar consequences of each position. At the time the project was planned, and at the time the parties entered into the Financial Agreement, it was anticipated that the total project cost would be approximately $50,082,500. If the total project cost represented the market value of the property at Newark’s then-applicable (1991) effective tax rate of $3.14 per $100 of market value, then taxes, absent an agreement, would have been approximately $1,572,600 per year. Under the Financial Agreement, the in-lieu-of tax payment would be $1,001,650 per year (2% of $50,082,500) for 15 years. The City of Newark takes the position that it is entitled to this greater-than $1,000,000 annual payment. After passage of the BRA, if the Turbines are *68 removed from the tax base, the property, as the parties have stipulated for purposes of this litigation would be valued for tax assessment purposes at approximately $18,061,230.[5] At Newark’s 1993 effective tax rate of $3.38 per $100 of market value, annual real estate taxes would be approximately $610,500 (about $391,150 per year less than the originally-contemplated annual payments in-lieu-of taxes and approximately $1,181,450 less than what taxes would have been prior to the enactment of the BRA (and without benefit of an abatement agreement)). If the total project cost under the abatement agreement excludes the cost of the BRA property (the position of the plaintiff), in-lieu-of tax payments would then be approximately $361,225 per year (two percent of $18,061,230).
I.
Plaintiff argues that only taxable improvements may be included in the definition of “improvements” when calculating “total project cost” under N.J.S.A 40:55C-47. That statutory definition, quoted at n. 4, supra, includes as one of several elements of the total project cost the “cost of the land and improvements to the urban renewal corporation____” (emphasis added). This section, however, does not grant any exemption from real property taxation on the improvements as does N.J.S.A. 40:55C-65, but merely provides that the cost of improvements is to serve as the basis for calculating the total project cost subject to the annual service charge.
N.J.S.A 54:4-1 provides for the imposition of a tax on all real property in New Jersey “not expressly exempted from taxation or expressly excluded from the operation of this chapter____” The *69 statute goes on to provide that “[r]ea! property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto____” (emphasis added). As a result, both improvements and personal property affixed to the real property are subject to real property taxation unless specifically exempted from taxation by Chapter 54 or by another statute.
N.J.S.A. 40:55C-65 of the Fox-Lance Act provides that “[t]he ... improvements made in the development or redevelopment of a blighted area or area adjacent thereto ..., pursuant to this act, shall be exempt from taxation for a limited period----” (emphasis added). That section of the Fox-Lance Act does not provide any definition of “improvements.” In order to give full effect to the Fox Lance Act, the term “improvements” in N.J.S.A 40:55C-65 must be read to mean all taxable real property other than land. Taxable real property in New Jersey includes two categories of property in addition to land: improvements and personal property affixed to real property. N.J.S.A 54:4-1; R.C. Maxwell Co. v. Galloway Tp., 145 N.J. 547, 554, 679 A.2d 141 (1996). The parties agree that, prior to the passage of the BRA, the Turbines were subject to real property taxation under N.J.S.A 54:4-1. Badische Corp., supra, 11 N.J. Tax 385; Texas E. Transmission Corp., supra, 11 N.J. Tax 198; American Hydro, supra, 11 N.J. Tax 12. The Turbines became exempt from real property taxation through the execution of the Financial Agreement pursuant to the Fox-Lance Act. N.J.S.A 40:55C-65. Thus, this exemption from taxation predates and is independent from the enactment of the BRA.
If the Turbines are exempt from taxation as a result of the amendments to N.J.S.A. 54:4-1 made by the Business Retention Act, it is not as a consequence of that amended statute’s definition of improvements but as a consequence of section (b) of the statute which states:
Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless____
*70 b. The personal property so affixed is machinery, apparatus, or equipment used or held for use in business and is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property____
As our Supreme Court explained, “only affixed personal property, not improvements, can avoid being taxed by meeting subsections (a) and (b) [of N.J.S.A 54:4-1].” R.C. Maxwell, supra, 145 N.J. at 554, 679 A.2d 141. In short, even if the BRA removes the Turbines from the definition of “taxable property” under N.J.S.A 54:4-1, it cannot logically follow that the BRA amendment to N.J.S.A 54:4-1 amends the definition of the term “improvements” which are a component of total project cost under N.J.S.A 40:55C-47.
Accordingly, taxpayer’s argument that the word “improvements” used in calculating “total project costs” is synonymous with “improvements” in N.J.SA 54:4-1 is rejected.[6] Furthermore, the BRA does not exempt any “improvements” from taxation, but only certain categories of personal property affixed to real property. See R.C. Maxwell, supra, 145 N.J. at 554, 679 A.2d 141.
I am not persuaded that the term “improvements” in N.J.S.A 40:55C-47 is limited only to taxable improvements as provided in N.J.S.A 54:4-1 and N.J.S.A 40:55C-65. N.J.S.A. 40:55C-47 does not attempt to limit the term “improvements” to only those for *71 which a tax exemption has been granted. The calculations of total project cost and annual service charge are entirely separate and apart from the granting of an exemption on the otherwise taxable improvements on the subject property. Total project costs as defined in the statute are not synonymous with taxable value and are determined by adding a series of costs, not by finding value. The exemption is granted to encourage development in blighted areas, and the annual service charge is a “return for ‘municipal services supplied to [the urban renewal] project.’ ” Senate County and Municipal Gov’t Comm. Stmt, to Senate Bill No. 1561 (since codified as L. 1983, c. 258, which amended N.J.S.A 40:55C-65), 200th N.J.Legis., 2d Sess. at 1237 (1983). The city just as easily could have elected to charge plaintiff an annual service charge of 15% of the annual gross revenue from the project, N.J.S.A. 40:55C-65c(l) (discussed at n. 3), a calculation which does not involve any reference to the cost of the improvements, rather than the two percent of total project cost calculation used here.
“Total project cost” is a concept that is subject to negotiation and whose definition is fixed by the terms of the Financial Agreement. See N.J.S.A. 40:55C-58 (providing that the urban renewal entity is to provide in its application a statement of the estimated cost of the proposed project (paragraph (c)) and the projected annual service charge payments to the municipality under the financial agreement (paragraph (e)) for approval by the municipality) and N.J.S.A. 40:55C-62 (providing that the financial agreement set forth the estimated total project cost). Project costs were quantified in the letter from the Mayor to the City Council urging the Fox-Lance abatement agreement. The cornerstone of the Fox-Lance Act is the fact that a financial agreement and its terms and conditions must be agreed upon prior to the commencement of the construction of the improvements and the granting of the tax exemption. Tru Urban Renewal Corp. v. City of Newark, 11 N.J.Tax 63, 68 (Tax 1990). A municipality does not approve applications for exemptions under the Fox-Lance Act until it is satisfied that it will generate a certain stream of revenue from the annual service charge, and thus it will not agree to any exemption unless the total project cost is defined to *72 assure the city of that revenue. That is, no doubt, why the parties defined “Annual Service Charge” as “[t]he amount the Entity has agreed to pay the City in lieu of full taxation on the improvements.”
The parties here, after negotiation, agreed that the estimated annual service charge would be $1,001,650, subject to an audit report. That figure was determined to be two percent of the total project cost, estimated to be $50,082,500 based on, among other things, the cost of the improvements. The Financial Agreement at Section 1.2(xiii) defines improvements as “[a]ny building, structure or fixture permanently affixed to the land.” There is no reference in that definition to solely taxable improvements or N.J.S.A 54:4-1, even though the parties agree that the Turbines were taxable at the time they entered into the Financial Agreement.
Thus I find that N.J.S.A 40:55C-47 does not require that parties to a financial agreement made pursuant to the Fox-Lance Act define total project cost to include only taxable improvements, but may define improvements to include both taxable and nontaxable improvements as well as affixed personal property.
II.
The plaintiff argues that, because the parties did, in fact, treat only taxable improvements and affixed personal property as subject to the two percent calculation in determining the annual service charge, the passage of the BRA, coupled with Section 14.1 of the Financial Agreement, requires the City to adjust downward the in-lieu-of-tax payment due to the exclusion of the Turbines from the definition of taxable improvements. This argument requires an examination of the Financial Agreement.
In interpreting a contract, our courts require a determination of the intent of the parties, Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 183, 425 A.2d 1057 (1981), as expressed in the entire written instrument. New Wrinkle, Inc. v. John L. Armitage & Co., 238 F.2d 753, 756-57 (3d Cir.1956). *73 Such intent can be found through a consideration of the parties’ relations, the attendant circumstances of the agreement, and the objectives the parties were attempting to obtain. Insurance Co. of State of Pa. v. Palmieri, 81 N.J. Super. 170, 179, 195 A.2d 205 (App.Div.1963), certif. denied, 41 N.J. 389, 197 A.2d 15 (1964). Courts will endeavor to find reasonable meaning in keeping with the express general purpose of the contract. Id. Where the common intention of the parties is ambiguous, the fairest and most reasonable construction imposing the least hardship on either of the contracting parties shotild be adopted so that neither will have an unfair or unreasonable advantage over the other. Tessmar v. Grosner, 23 N.J. 193, 201, 128 A.2d 467 (1957).
Statutes in existence at the time a contract is executed are implicitly part of the contract. Doyle v. Northrop Corp., 455 F.Supp. 1318, 1330 (D.N.J.1978); Saffore v. Atlantic Cas. Ins. Co., 21 N.J. 300, 310, 121 A.2d 543 (1956). Changes in the law subsequent to the execution of a contract are not binding on the parties unless the language of the agreement clearly indicates that the parties intended otherwise. See 17 Am.Jur.2d sec. 382 (1991) (citing Feakes v. Bozyczko, 373 Mass. 633, 369 N.E.2d 978 (1977) and Equitable Bldg. & Loan Ass’n v. Wolfangle, 111 Cal.App. 119, 295 P. 388 (1931)).
The parties expressed their intentions through the execution of the Financial Agreement. I must determine whether the parties intended that the agreement be governed, in part, by N.J.S.A 54:4-1 and its subsequent amendment by the BRA. The Financial Agreement contains several sections regarding the law to govern the contract. Section 1.1 provides:
This agreement shail be governed by the provisions of the Urban Renewal Corporation and Association Law of 1961, as amended and supplemented, (N.J.S.A. 40:55C-40, et. seq.) and Newark Revised Ordinances, Title 10, Finance and Taxation, Chapter 11, as amended and supplemented being sometimes herein referred to as the “Governing Law.”
In Section 1.2, captioned “General Definitions,” the agreement provides under subsection xi. that
*74 the term “Governing Law” shall refer to the Urban Renewal Corporation and Association Law of 1961, as amended and supplemented Q7.J.S.A. 40:55C-40, et seg.) Newark Revised Ordinances, Title 10, Finance and Taxation, Chapter 11 as amended and supplemented, Federal, State and Municipal statutes and ordinances, resolutions, rules and regulations.
Under subsection xviii. of the general definition section, “Law” is defined as
all appropriate Newark Revised Ordinances, Title 10, Finance and Taxation, Chapter 11 as amended and supplemented, Federal, State and Municipal statutes, ordinances, resolutions, rules and regulations.
The above quoted sections are in addition to Section 14.1 of the Financial Agreement, quoted above in full, which states that the plaintiff is “bound by the relevant provisions of the Federal and State Statutes and Municipal Ordinances including but not limited to N.J.S.A 40:55C-40, et seq., and the provision of the City of Newark’s R.O. 10:13-1, et seq. as amended and supplemented.” Section 14.1 then goes on to provide that the plaintiff is subject to any new legislation that amends or revises these laws.
It is clear from the language of these various provisions in the Financial Agreement that the parties intended to be bound by the Fox-Lance Act, the City’s ordinances pursuant to that Act, and any future amendments to either. The question is, to what extent did the parties intend to bind themselves to changes in the other federal, state or local laws, not specifically referred to in the above provisions? The Financial Agreement makes specific reference to statutes or ordinances unrelated to the Fox-Lance Act in only a few places: Section 2.3 (affirmative action); Sections 4.3, 5.1, and 18.2 (foreclosure); Section 16.1 (waste disposal and recycling); and Section 19.2 (accounting of reserves and excess profits). Section 2.4, dealing with land tax credits under the Fox-Lance Act, makes specific reference to future amendments to that Act and the parties’ intent on being bound by such changes in the law.
There is no reference to N.J.S.A 54:4-1 anywhere in the Financial Agreement (except mistakenly in Section 18.2 which meant to refer to N.J.S.A. 54:5-1, et. seq.), and there is no *75 indication that the parties sought to be bound by subsequent changes to that provision. There are two provisions in the Financial Agreement which lead me to this conclusion. First, in Section 4.1 providing for the annual service charge in consideration for the granting of the tax exemption, the parties state that “[t]wo percent of the owner-occupied total project’s cost for that portion of the project ... is presently estimated to be $1,001,650.” (Emphasis added). Similarly, paragraph nine of the City’s July 2, 1991 resolution granting the abatement to the plaintiff provides that “[t]he ‘Applicant’ shall from the time the annual service charge on the improvements becomes effective pay to the City the estimated quarterly service charge of $250,412.50 for the project until the correct amount due from the applicant is determined by the certified financial audit report, ...” (Emphasis added). The “contract” between the parties includes both the resolution and the Financial Agreement according to Section 20.3 of the agreement. The use of the term “estimated” in each document is significant.
While a contract that lacks certainty may be unenforceable, Lo Bosco v. Kure Engineering Ltd., 891 F.Supp. 1020, 1026 (D.N.J.1995), Lind v. Schenley Indus., Inc., 167 F.Supp. 590, 595-96 (D.N.J.1958), rev’d on other grounds, 278 F.2d 79 (3d Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960), an open price term that is calculated from an objectively based determination is enforceable. See Einhorn v. Ceran Corp., 177 N.J.Super. 442, 449, 426 A.2d 1076 (Ch.Div.1980), aff'd o.b., 185 N.J.Super. 8, 447 A.2d 186 (App.Div.), certif. denied, 91 N.J. 534, 453 A.2d 856 (1982) (requiring fixed standard for determining increases in price escalators). The parties agreed here to an objectively based determination for price, namely, two percent of total project cost, and thus that price term is enforceable. They just as easily could have agreed to 15% of annual gross revenue as the basis for calculating the in-lieu-of tax payments. N.J.S.A. 40:55C-65 (see n. 3, supra). However, the parties agreed that the total project cost figure was subject to adjustment following an audit, and thus the *76 parties provided that the price term in the Financial Agreement and in the resolution was an estimation. But, in describing the annual service charge as an estimated figure, the parties were also acknowledging that the subsequent upward or downward adjustments as the result of the audit would be minimal.
The use of the word “estimate,” “estimated,” or “estimation” with reference to quantity or amount ordinarily indicates that the quantity or amount is not attempted to be stated with mathematical exactness, and hence the instrument must not be interpreted as if it contained an exact statement of the quantity or amount. Such words are in fact equivalent to the expression “more or less” and should be given a like interpretation. It has been said that the terms “by estimation, ” “mare or less, ” or other expressions of similar import, added to a statement of quantity, can be considered only as covering inconsiderable or small differences one way or the other. [17 Am.Jur.2d sec. 374 (1991) (emphasis added) ]
The term “more or less” requires “immaterial variations” in quantity. Id.
The adjustments made by Deloitte & Touche, the auditor of the cost of the improvements for the plaintiff, were not inconsiderable or immaterial. The total project cost figure decreased from $50,082,500 to $18,061,230, an adjustment of almost 64%. Stated another way, the final determination by Deloitte & Touche was only a little more than one third of the original estimate. This adjustment is well beyond what the parties contemplated when agreeing to the estimated annual service charge that was provided in the Financial Agreement and the City’s resolution.
The second provision in the Financial Agreement that indicates the parties’ intent not to be bound by future changes to N.J.S.A. 54:4-1 is Section 1.1. That section, discussed above with respect to the governing law of the contract, also provides: “It being expressly understood and agreed that the City expressly relies upon the facts, data, and presentations contained in the Application attached hereto in granting this tax abatement.” In question eight of the abatement application, the plaintiff indicates that the estimated total project cost is $50,082,500. That figure in the application is not conditioned on any legal conclusion as to the taxability of the improvements under N.J.S.A. 54:4-1 or any other *77 statute. Clearly, the City relied on that figure in agreeing to grant the Fox-Lance tax abatement and in calculating the annual service charge, since that same number serves as the basis for the figures that appear both in the Financial Agreement and in the City’s resolution.
If “total project cost” could be reduced, under the terms of the contract, by 64%, that would amount to a windfall to the plaintiff and an unanticipated loss to the City which could not have been intended by the parties at the time they entered into the Financial Agreement.
Therefore, I find that the parties did not intend to be bound by subsequent changes to N.J.S.A 54:4-1. The passage of the BRA is without consequence to the calculation of the total project cost and the annual service charge in the Financial Agreement. The fact that the actual total project cost was not determined, and could not be determined, until after the completion of the improvements when the BRA was law, is also irrelevant. The Financial Agreement was executed prior to the passage of the amendment to N.J.S.A 54:4-1, and only the law at the time the contract was executed governs, Doyle, supra, unless there is evidence the parties intended to be bound by subsequent changes. The plaintiff has failed to provide convincing evidence that the parties intended that subsequent changes to N.J.S.A 54:4-1 would change the definition of “total project cost” found in the Fox-Lance Act and their Financial Agreement.[7] Although the parties used a statutory formula to calculate the in-lieu-of tax payment, their agreement was grounded in an understanding that when payment *78 would not vary substantially from the amount estimated in the Financial Agreement.
III.
Plaintiff argues that the defendant waived any challenge to the exclusion of the Turbines from the calculation of total project cost and the annual service charge. This waiver, according to the plaintiff, occurred because, after the audit report on the cost of the improvements was submitted to the City for approval, the City never disputed the exclusion of those improvements. Instead, the City only challenged the audit report’s format and the figures for the developer’s fees (which pursuant to N.J.S.A. 40:55C-47 is one component in the calculation of total project cost).
‘Waiver” is a distinctive principle that may be invoked where a party expresses a clear, unequivocal, and decisive act from which an intention to relinquish a right (in this case, a right to a higher total project cost base from which the annual service charge would be calculated) can be based. West Jersey Title & Guaranty Co. v. Industrial Trust Co., 27 N.J. 144, 152-53, 141 A.2d 782 (1958). Plaintiff has failed to show that the defendant intended to relinquish its right to the higher total project cost base. In fact, although the defendant may have not expressly objected to the exclusion of the improvements from the total project cost base, it did, as plaintiff concedes, always bill plaintiff at the higher amount, both before and after the audit report was issued. This behavior does not constitute a waiver.
“Equitable estoppel” is the concept that a party, by voluntary conduct or words, reasonably misleads another party so that a repudiation of that conduct or those words would be unjust. State v. United States Steel Corp., 22 N.J. 341, 357-58, 126 A.2d 168 (1956); Miller v. Board of Trustees of Teachers’ Pension and Annuity Fund, 179 N.J.Super. 473, 476-77, 432 A.2d 560 (App. *79 Div.), certif. denied, 88 N.J. 502, 448 A.2d 714 (1981). This principle may not be invoked by the plaintiff here. Courts have generally rejected its application against taxing authorities. See Black Whale, Inc. v. Director, Div. of Taxation, 15 N.J.Tax 338, 354-55 (Tax 1995) (summarizing the law on equitable estoppel as it applies to taxing authorities). The plaintiff has not put forth any evidence of detrimental reliance on the defendant’s failure to raise with plaintiff the issue of the exclusion of the improvements.
IY.
I hold that, under the Financial Agreement between the parties, the cost of the Turbines is to be included in the determination of total project cost when calculating the annual service charge in-lieu-of taxes. Such calculation is subject to small adjustments pursuant to a cost audit performed by plaintiffs auditor and approved by the defendant.
Although not specifically addressed in this summary judgment motion, as a consequence of the court’s determination and declaration that payments in-lieu-of taxes are to be calculated as two percent of total project costs, including the Turbines, plaintiffs demand for a refund must be denied.
The defendant will submit an order under the 5-day rule. It. 4:42-1.

 Repealed by L. 1991, c. 431, § 20 and replaced by N.J.S.A. 40A:20-1 to -20, the Long Term Tax Exemption Law.

 NJ.S.A. 40:55C-58 provides:
Every urban renewal corporation or association qualifying under this act, before proceeding with any project herein authorized, shall make written application to the municipality for approval thereof. Said application shall be in such form and shall certify to such facts and data as shall be required by the municipality, and may include but shall not be limited to:
(a) A general statement of the nature of the proposed project, that the undertaking conforms to all applicable municipal ordinances, that its completion will meet an existing need, and that the project accords with the master plan or official map, if any, of the municipality.
(b) A description of the proposed project outlining the area included and a description of each unit thereof if the project is to be undertaken in units and setting out such architectural and site plans as may be required.
(c) A statement of the estimated cost of the proposed project in such detail as may be required, including the estimated cost of each unit if it is to be so undertaken.
(d) The source, method and amount of money to be subscribed through the investment of private capital, setting forth the amount of stock or other *64 securities to be issued therefor or in the case of an association the extent of capital invested and the proprietary or ownership interest obtained in consideration therefor.
(e) A fiscal plan for the project outlining a schedule of annual gross revenue, the estimated expenditures for operation and maintenance, payments for interest, amortization of debt and reserves, and payments to the municipality to be made pursuant to a financial agreement to be entered into with said municipality.
Such application shall be addressed and submitted, to the mayor of the municipality, who shall, within 60 days after receipt thereof, submit it with his recommendations to the governing body. The governing body shall by resolution approve or disapprove the application, but in the event of disapproval, changes may be suggested to secure its approval. An application may be revised and resubmitted.

 Under N.J.S.A. 40:550-65, the municipality has the option of two annual service charge calculation approaches. Under subsection c(l), the taxpayer must pay an annual service charge equal to 15% of the annual gross revenue from the project. However, if the municipality determines that it cannot reasonably ascertain the annual gross revenue from the project, it may require the taxpayer to pay an annual service charge equal to 2% of the total project cost as provided under NJ.S.A. 40:55C-47. The City of Newark, in the within matter, has elected the latter method of calculating the annual service charge.

N.J.S.A. 40:55C-47 provides:
*65 "Total project unit cost” or "total project cost" means the aggregate of the following items as related to any unit of a project if the project is to be undertaken in units or to the total project if the project is not to be undertaken in units: (a) cost of the land and improvements to the urban renewal corporation or association whether acquired from a private or public owner, such cost in the case of leasehold interests to be computed by capitalizing the aggregate rental at a rate provided in the financial agreement; (b) architects', engineers' and attorneys' fees paid or payable by the corporation or association in connection with the planning, construction and financing of the project; (c) surveying and testing charges in connection therewith; (d) actual construction costs as certified by the architect, including the cost of any preparation of the site undertaken at the corporation’s or association's expense; (e) insurance, interest and finance costs during construction; (f) cost of obtaining initial permanent financing; (g) commissions and other expenses paid or payable in connection with initial leasing or sale of units; (h) real estate taxes and assessments during the construction period, and (i) a developer’s overhead based on a percentage of (d) above,

 This figure represents the total value/cost of the project less the value/cost of the Turbines (which both parties agree for purposes of this litigation is BRA property not subject to local property taxation, N.J.S.A. 54:4-1, as amended by L. 1992, c. 24). For purposes of this litigation, I have followed the parties' agreement and assumed that the Turbines are not subject to the local property tax. See General Motors Corp. v. City of Linden, supra, for the most recent interpretation of that statute.

 "Statutes in pari materia, that is, those which relate to the same matter or subject, although some may be special and some general, are to be construed together as a unitary and harmonious whole, in order that each may be fully effective.” Vicoa, Inc. v. Director, Div. of Taxation, 166 N.J.Super. 496, 502, 400 A.2d 105 (App.Div.1979) (quoting Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411, 421, 147 A.2d 1 (1958)). "As one part of a statute is properly called in, to help the construction of another part, ‘and is fitly so expounded, as to support and give effect, if possible to the whole; so is the comparison of one law with other laws made by the same legislature, or upon the same subject, or relating expressly to the same point, enjoined for the same reason, and attended with a like advantage.’ " Clifton, supra, 28 N.J. at 421, 147 A.2d 1 (citation omitted). The Fox-Lance Act and the tax statutes must be read together. As explained in the text of this opinion, however, the term "improvements” in the Fox-Lance Act includes more than the term “improvements” in NJ.S.A. 54:4-1.

 General Motors Corp. v. City of Linden, supra, leaves open for subsequent determination the extent to which the BRA effectively amended N.J.S.A. 54:4-1. See especially the concurring opinion of Justice Handler. 150 N.J. 522, 543-548, 696 A.2d 683. For purposes of this litigation, the parties have agreed that the Turbines are exempt from taxation after enactment of the BRA. Since I find that the enactment of the BRA had no effect on the terms of the Financial Agreement, I do not need to confirm that the stipulation is the result of a proper interpretation of the law.