SMALL, J.T.C.
On June 19, 1991, plaintiff, Tiffany Manor Associates, L.P., and the defendant, City of Newark (“City”), entered into a financial agreement calling for an abatement of taxes and a payment in lieu of taxes to be made to the City of Newark pursuant to the provisions of N.J.S.A. 55:14K-37b (the New Jersey Housing and Mortgage Financing Agency “NJHMFA” Law). Tiffany Manor has made payments in lieu of taxes (“PILOT”) called for by the agreement for each year in which that payment was due. For the years beginning in 1994 and following, the City has billed Tiffany Manor for land taxes on the subject property. Tiffany Manor has protested those taxes but paid them, pending resolution of the issue which is before this court. Tiffany Manor argues that the agreed-upon payment in lieu of taxes under the June 1991 agreement constitutes the entire amount due from it to the City with respect to the PILOT and land taxes. It argues, in the alternative, that the agreement either exempted the property from land taxes or that the land taxes paid to the City should be deducted from the calculation of the payment in lieu of taxes.
The municipality argues that the agreement only contemplated a payment in lieu of taxes on the improvements to the property, and that taxpayer owes both the payment in lieu of taxes and the land tax with respect to the subject property. Additionally, the City argues that, under the relevant statute, the City has no authoi'ity to grant an exemption from land taxes and that under the Constitution, Art. VIII, § 1, ¶ 1, an exemption from land taxes would be forbidden.
*192 The intervenor, New Jersey Housing and Mortgage Finance Agency, argues that the statute, N.J.S.A. 55:14K-37, exempts the project land from taxation and that such exemption is constitutional.
For the reasons expressed below, I find that the payment in lieu of taxes contemplated by the agreement between the parties provides for a credit for the land tax payment against the total payment in lieu of taxes. The agreement does not call for an exemption from land taxes, and accordingly, the issue of whether an agreement that did call for the exemption from land taxes is within the bounds of the statute or the Constitution need not be addressed.[1]
The court has before it cross-motions for summary judgment in two actions filed by Tiffany Manor. One action (Docket No. 7483-97) is a challenge to the 1997 assessment for land taxes. Having indicated above that I find that the property is not exempt from land taxes, that action must be dismissed. The second action, (Docket No. 473-97), initially filed in the Chancery Division of the Superior Court, calls on the court to interpret the agreement and to order appropriate refunds or credits in accordance with that interpretation.
N.J.S.A. 55:14K-37b provides:
The governing body of any municipality in which a housing project financed or to be financed by the agency is or is to be located may by ordinance or resolution, as appropriate, provide that such project shall be exempt from real property taxation, if the housing sponsor enters into an agreement with the municipality for payments to the municipality in lieu of taxes for municipal sendees. Any such agreement may require the homing sponsor to pay to the municipality an amount up to 20% of the annual gross reverme from each housing project situated on such real property *193 for each year of operation thereof following the substantial completion thereof. For the purpose of this section, “annual gross revenue” means the total annual gross rental or carrying charge and other income of a housing sponsor from a housing project. If any such agreement is entered into from the date of recording the mortgage on the project to the date of substantial completion of the project, the annual amount payable to the municipality as taxes or as payments in lieu of taxes in respect to the project site shall not be in excess of the amount of taxes on the project site for the year preceding the recording of the mortgage. Any agreement between any housing sponsor and a municipality pursuant to this subsection shall be submitted to the agency for review in order to avoid duplicating, overlapping or inconsistent regulations or provisions. Any exemption from taxation pursuant to the provisions of this section shall not extend beyond the date on which the eligible loan made by the agency on the project is paid in full.
[Emphasis added.]
Pursuant to that provision, the June 19, 1991 agreement between taxpayer and municipality provided as follows:
In consideration of the aforesaid exemption from taxation on improvements, the “Entity” shall make payment to the City as follows-
(1) until the date of substantial completion (hereafter defined) of the project, an annual amount equal to the amount of real property taxes paid and to be paid based on assessed values, as if an exemption had not been granted; and, thereafter,
(2) an annual service charge from the date of substantial completion of the project (hereafter defined) for the term of thirty (30) years, in an amount equal to 6.28% of the gross annual rental revenues of the project as defined in the manner set forth in Exhibit “A” attached hereto.
[Emphasis added.]
Other provisions of the agreement relevant to its interpretation are in Paragraph 5(b), which provides as follows:
In the event the number of apartments are increased or decreased upon the site, it is understood and agreed that the annual municipal service charge shall be adjusted in accordance with the annual rent receipts formula set forth in Exhibit “A” attached hereto. However, the minimum amount of the annual seivice charge in any given year will always be at least an amount equal to $38,227.50 which is the amount of the total real estate taxes prior to acquisition by the Entity.
The agreement also refers in Paragraph 15 to a financial plan which is attached as Exhibit “A” to the agreement. The resolution of the City Council adopting the agreement provides in Paragraphs 10,11, and 12, as follows:
10. The Applicant referred to in the accompanying tax abatement agreement as the “Entity”, shall from the time the annual service charge on the improvements become effective, and on the scheduled quarterly payment dates, pay the City the estimated quarterly seivice charge of $20,575.25 until the correct amount due from the applicant is determined by the auditor’s report, required to be submitted to the *194 Director of Finance and the City Clerk, by the Financial Agreement. After the said auditor’s report has been accepted by the City’s Dii'ectox- of Finaixce, and within 90 days thereafter, the City and the Applicant will adjust any over or under payment so made, or needed to be made, for the particular pei-iod covex-ed by the auditoi'’s report.
11. The annual service charge shall be calculated as 6.28% of the annual gross revenues derived from the project.
12. The following oceuxrences ax'e expx-ess conditions of the granting' of this tax abatement to be performed by the Tiffany Manor Associated, L.P.
(a) the entity shall pay fall taxes on the land and improvements contained in the project until the annual service charge becomes effective. Thereafter, the entity shall pay all appropriate taxes on land and improvements plus an annual service charge.
[Exnphasis added.]
Exhibit “A” referred to in the agreement provides a summary of annual expenses as follows:
1. A) Base interest and amortization 9.000000% $1,245,289
B) Agency fees and charges 0.5000% 64,251
C) Maintenance, admin., repairs, contract expenses & payroll ($/annum 157.49 x 580.50 rooms) 108,839
D) Reserves. 4.0000% of gross rents 52,421
E) Return on equity (.8.0000%[sie], OH $1,537,-621) 123,010
F) Subtotal 1,593,810
G) Payment in lieu of taxes 6.2800% of GSR 82,301
H) Other: Mgmt. fee 6% 77,901
I) Subtotal 1,754,012
J) Vacancy loss 5.0000% 65,526
K) Utilities ($/annum 44.44 x 580.50 rooms) 25,800
L) Insurance 32,250
2. Total base annual expenses 1,877,588
3. Total base monthly expenses 156,466
4. Total annual income 1,316,520
[Emphasis added.]
Read together, these provisions of the statute, financial agreement, and city council resolution, lead me to the following conclusions: (1) Only the improvements are exempt from taxation (agreement). (2) The payment in lieu of taxes may be any negotiated amount up to 20% of annual gross revenue (statute). *195 (3) The payment in lieu of. taxes is agreed to be 6.28% of gross annual rental revenues in Exhibit “A” (agreement). (4) The land taxes are payable as are the payments in lieu of taxes (resolution 1112(a)). (5) The payments in lieu of taxes are $82,301 per year (agreement Exhibit “A”). (6) The agreement adopted by resolution of the city council has no separate provision for land taxes. (7) The land taxes must be a credit against the payment in lieu of taxes. Stated another way, since only the improvements are exempt, the land is taxable. The parties agreed that total payments by Tiffany Manor to the City would be $82,301 per year. The only way to achieve this objective is by crediting the land taxes against the quantified payment in lieu of taxes.
In order to properly interpret the agreement between taxpayer and the municipality, it is necessary to understand the provisions of another section of the New Jersey statutes, which grants abatements for residential real estate. Additionally, the court’s attention has been called to the maimer in which the tax abatement for a project similar to Tiffany Manor was handled, and that, too, provides some insight into a proper interpretation of the agreement between the parties. The relevant provisions of the New Jersey statutes, is N.J.S.A. 40A:20-11 and -12. Those sections of the Long-Term Tax Exemption Law which provide for the exemption from taxation of certain property and the calculation of the payment in lieu of taxes.
40A:20-11. Financial agreement; tax exemption provisions; annual service charge schedule
A financial agreement approved pursuant to this act shall include findings by the municipality, approved by the municipal governing body, setting forth appropriate tax exemption provisions and an appropriate annual service charge schedule which shall be based upon the provisions of Section 12 of this act..
40A:20-12. Exemption of rehabilitation or improvements from taxation; duration; annual service charge; determination; credits; minimum annual sendee charge; termination of exemption
The rehabilitation or improvements made in the development or redevelopment of a redevelopment area or area appurtenant thereto or for a redevelopment relocation housing project, pursuant to this act, shall be exempt from taxation for a limited period as hereinafter provided. The exemption shall be claimed and allowed in the same or a similar manner as in the case of other real property exemptions, and no such claim shall be allowed unless the municipality wherein the *196 property is situated shall certify that a financial agreement with an urban renewal entity for the development or the redevelopment of the property, or the provision of a redevelopment relocation housing project, or the provision of a low and moderate income housing project has been entered into and is in effect as required by this act. Whenever an exemption status changes during a tax year, the procedure for the apportionment of the taxes for the year shall be the same as in the case of other changes in tax exemption status during the tax year.
At the option of the municipality, or where because of the nature of the development, ownership, use or occupancy of the project or any unit thereof, if the project is to be undertaken in units, the total annual gross rental or gross shelter rent or annual gross revenue cannot be reasonably ascertained, the governing body shall provide in the financial agreement that the annual service charge shall be a sum equal to a percentage determined pursuant to this subsection and section 11 of this act, of the total project cost or total project unit cost determined pursuant to this act calculated from the first day of the month following the substantial completion of the project or any unit thereof, if the project is undertaken in units. The percentage of the total project cost or total project unit cost shall not be more than 2% in the case of a low and moderate income housing project, and shall be 2% in the case of all other projects.
(2) In either case, the financial agreement shall establish a schedule of annual service charges to be paid over the term of the exemption period....
The annual service charge shall be paid to the municipality on a quarterly basis in a manner consistent with the municipality’s tax collection schedule.

Against the annual service charge the urban renewal entity shall be entitled to credit for the amount, without interest, of the real estate taxes on land paid by it in the last four preceding quarterly installments.

Notwithstanding the provisions of this section or of the financial agreement, the minimum annual service charge shall be the amount of the total taxes levied against all real property in the area covered by the project in the last full tax year in which the area was subject to taxation, and the minimum annual service charge shall be paid in each year in which the annual service charge calculated pursuant to this section or the financial agreement would be less than the minimum annual service charge.
[Emphasis added.]
Of significant importance, in comparing this statute with the statute under Title 55, is the above quoted paragraph which states:
Against the annual service charge, the urban renewal entity shall be entitled to credit for the amount, without interest, of the real estate taxes on land paid by it in the last four preceding quarterly installments.
Such language is not a part of N.J.S.A. 55:14K-37b, the statute under which a project similar to the Tiffany Manor project, NOBE Urban Renewal Development Corporation, subsequently renamed *197 Eban Square, received an abatement. An abatement was initially contemplated for this other project under Title 40A. Subsequent to the initial determination, it was decided that the abatement for taxes would be authorized under N.J.S.A. 55:14K-37. In that case, when the abatement was changed, the issue of the appropriate treatment of land taxes was addressed and was clarified by a resolution of the City Council of Newark and by a provision in the amended agreement which specifically granted the sponsor a credit for land taxes in a manner similar to the statutory credit provided by Title 40A. Those discussions and negotiations took place in 1992 and 1993.
The Tiffany Manor exemption agreement was entered into in 1991. In 1995, after conclusion of the Eban Square agreement, the City billed Tiffany Manor for land taxes, in addition to its PILOT. Although the record is not clear as to why the City only began such billings in 1995, rather than 1991, one can speculate that, having inserted a specific provision in • the Eban Square project financial documents providing for a credit for land taxes, and not having such a provision in the Tiffany Manor financial agreement, the City felt it appropriate to bill the non-explicitly credited Tiffany Manor for land taxes.
This is a ease of statutory and contract interpretation. There are two conflicting rules governing the interpretation of the statutory and contract provisions applicable in this case. One says that since the language of N.J.S.A. 40A:20-12 and N.J.S.A. 55:14K-37b differs. The statutes must be read as having different meanings. (In fact, the need for the specific amendatory language in the Eban Square project makes clear that there was a doubt as to whether a credit for land taxes was appropriate under N.J.S.A. 55:14K-37b.) The other rule of statutory and contract construction says that the specific governs the general. See NBCP v. Newark, 17 N.J.Tax 59, 75-77 (Tax 1997), aff’d ob, 17 N.J.Tax 505 (App.Div.1998). In this case, Exhibit “A” to the agreement, which sets out the annual expenses of the project, has a line for payment in lieu of taxes of $82,301 (or 6.2800% of GSR — gross shelter rent). There is no separate line for land taxes.
*198 N.J.S.A 55:14k-i>7b provides that the payment in lieu of taxes may be “an amount up to 20% of the annual gross revenue from each housing project.” The percentage chosen in this case, 6.28%, indicates that an allowable percentage was selected in order to arrive at an agreeable total payment. The fact that no separate provision was made in Exhibit “A” to the financial agreement for the payment of land taxes is further evidence that neither party contemplated that the total of land taxes and payments in lieu of taxes would exceed $82,301. In the Eban Square project, the agreed upon PILOT was 6.2833% of gross shelter rent less land taxes. If the Tiffany Manor calculation were 6.28%, with no exclusion for land taxes, it would be substantially different from the payment in the Eban Square project.
Although Title 40A provides some instances for a specific percentage to be used in calculating the PILOT (2% of cost), the NJHMFA statute simply limits the calculation to 20% of annual gross revenue. N.J.S.A. 40A:20-12; N.J.S.A. 55:14K-37b. Thus, under the statute, a PILOT of 6.28% of gross shelter rents less land taxes would be permitted. Exhibit “A” to the Financial Agreement specifies the amount of the PILOT and is silent both as to the amount of the land taxes and as to whether the land taxes are to be credited against the PILOT. A reading that the land taxes are to be credited against the PILOT is permissible under the .statute as the net PILOT would be less than 20% of annual gross rent. The fact that the NJHMFA statute and the Long Term Tax Exemption Law have different formulations of the calculation of the PILOT does not preclude the agreement to calculate a PILOT under the NJHMFA statute, so long as the amount does not exceed 20% of the annual gross revenue of the project.
I find that, under the agreement entered into by the City and Tiffany Manor, both- parties contemplated that there would be an annual payment of $82,301, subject to adjustments. This was denominated in the agreement as a payment in lieu of taxes. There was no separate line for land taxes in the agreement. Tiffany Manor was billed for the full amount as a payment in lieu *199 of taxes. The proper way to have denominated the cost and billed Tiffany Manor would have been to reduce the payment in lieu of taxes by the land tax due and add a separate line in the agreement for land taxes and bill them separately.
I find that the meeting of the minds of the parties in 1991 focused on the financial agreement, and in particular, Exhibit “A” which explicitly provided for a payment in lieu of taxes and did not provide for a land tax. The fact that an exemption for land taxes is questionable under the Constitution does not mean that the parties agreed to a PILOT and land taxes payment, as opposed to agreeing to a credit for the land taxes against the PILOT. I find that the latter is what was contemplated, a total payment of $82,301 for both land taxes and PILOT. The fact that the Eban Square documentation provided for this explicitly does not defeat the finding that this is precisely what Tiffany Manor and Newark agreed to implicitly in their financial agreement.
Thus, I interpret the agreement as not exempting the property from the land tax (because it does not do so explicitly), but providing for a credit against the payment in lieu of taxes for the land tax. That is what was intended by the financial agreement. That interpretation offends neither the Constitution, the statute, nor canons of contract interpretation.
Accordingly, in Docket No. 473-97, the case challenging the calculation of the PILOT, the City will give the plaintiff a credit for the land taxes paid against its obligation for payments in lieu of taxes.
In Docket No. 7483-97, the ease claiming exemption from land taxes, the tax assessment is affirmed.

 The NJHMFA argues that it has interpreted its statute as specifically permitting a tax exemption for the land of agency-sponsored projects. It carefully analyzes its statute and the relevant constitutional provisions. N.J. Const, art. VIII, § 1, H 1(a) and art. VIII, § 1, ¶ 2. I neither adopt nor reject that argument, as I find that a proper interpretation of the agreement between the City of Newark and the housing sponsor and the implementing municipal resolution did not contemplate an exemption from land taxes. The issue in this case (the proper payments from Tiffany Manor to the City) can be resolved without addressing the constitutional issue.